11-5003-cv
C.F., by His Parents R.F. and G.F. v. New York City Department of Education

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: January 10, 2013　　　　　　　　　　Decided: March 4, 2014)

Docket No. 11-5003-cv

_____

C.F., BY HIS PARENTS R.F. AND G.F.,

*Plaintiffs-Appellants*,

v.

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee*.

_____

Before: WINTER, POOLER, and CHIN, *Circuit Judges*.

Appeal from an October 28, 2011 opinion and order of the United States District Court for the Southern District of New York (Laura Taylor Swain, *J.*), seeking, pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, reimbursement of school placement expenses for the 2008-2009

school year. Plaintiffs R.F. and G.F. unilaterally placed their child C.F., a child with autism, in a private placement. They then sought reimbursement by filing a due process complaint with the New York City Department of Education. On June 14, 2010, the Impartial Hearing Officer granted the request, but, on September 8, 2010, the State Review Officer reversed the Impartial Hearing Officer's decision. The district court affirmed the State Review Officer, and plaintiffs now appeal. Upon review, we hold that plaintiffs are entitled to reimbursement under the *Burlington/Carter* Test. The judgment of the district court is VACATED and the case is REMANDED.

_____

GARY S. MAYERSON (Tracey Spencer Walsh, Maria C. McGinley, *on the brief*) Mayerson & Associates, New York, NY, *for Plaintiffs-Appellants*.

TAHIRIH SADRIEH, of Counsel (Edward F. X. Hart, Emily Sweet, of Counsel, Michael A. Cardozo, Corporation Counsel of the City of New York, *on the brief*) New York, NY, *for Defendant-Appellee*.

POOLER, *Circuit Judge*:

Plaintiffs-Appellants C.F. and his parents R.F. and G.F. (collectively "Plaintiffs") appeal from the October 28, 2011 opinion and order of the United

States District Court for the Southern District of New York (Laura Taylor Swain,

*J.*), seeking, pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400 *et seq.*, reimbursement of school placement expenses

for the 2008-2009 school year.  R.F. and G.F. unilaterally placed their son C.F., a

child with autism, at the McCarton School ("McCarton"), after which they sought

reimbursement by filing a due process complaint with the New York City

Department of Education (the "Department").  On June 14, 2010, the Impartial

Hearing Officer ("IHO") granted the request, but, on September 8, 2010, the State

Review Officer ("SRO") reversed the IHO's decision.  The district court affirmed

the SRO, and Plaintiffs now appeal.  Upon review, we hold that Plaintiffs are

entitled to tuition reimbursement under the *Burlington*/*Carter* Test.[1]  The

judgment of the district court is VACATED and the case is REMANDED.

**BACKGROUND**

**I.  Legal Background**

States that receive funding under the IDEA must provide all disabled

children with a free appropriate public education.  20 U.S.C. § 1412(a).  "A free

---

[1] The Test is named after the Supreme Court cases that established it.  *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).

appropriate public education must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006) (internal quotation marks omitted). In order to ensure that disabled children receive a free appropriate public education, school districts must create individualized education programs ("IEPs") for such children. *Id.*; *see also* 20 U.S.C. § 1414(d) (listing IEP requirements). IEPs must include "a comprehensive statement of the educational needs of [the] handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Frank G.*, 459 F.3d at 363 (internal quotation marks omitted). "In New York, the state has assigned responsibility for developing IEPs to local Committees on Special Education . . . ." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citing N.Y. Educ. Law § 4402(1)(b)(1)),[2] *cert. denied*, 133 S. Ct. 2802 (2013). Such Committees "are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special

---

[2] All citations to New York statutes are to McKinney's Consolidated Laws of New York Annotated (West 2013).

education teacher, a school board representative, a parent representative, and others." *Id.* (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)); *see also* N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8, § 200.3(a).

"The IDEA requires that an IEP be reasonably calculated to enable the child to receive educational benefits." *R.E.*, 694 F.3d at 175 (internal quotation marks omitted). "The purpose of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998) (internal quotation marks omitted). The IDEA's "appropriate" education standard does not require that a child be provided with the optimal programmatic alternative. *See id.* at 132. Rather, it calls only for selection of a program that provides a "basic floor of opportunity," *id.* (internal quotation marks omitted), that is "likely to produce progress, not regression," *id.* at 130 (internal quotation marks omitted). "[B]ecause public 'resources are not infinite,' federal law 'does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each [disabled] child.'" *Id.* (quoting *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (Ruth Bader Ginsburg, *J.*)).

5

Additionally, both federal and state law impose certain procedural requirements on Committees on Special Education. Relevant to this appeal are the following requirements:

> For students who engage in behaviors that impede learning, Committees shall conduct, as necessary, functional behavioral assessments that determine why the student engages in such behaviors and how the behaviors relate to the environment. NYCRR §§ 200.1(r), 200.4(b)(1)(v), 200.22(a).
>
> For students who in engage in behaviors that impede learning despite consistent interventions, Committees shall consider the development of a "behavioral intervention plan," based on the functional behavioral assessment, that creates a baseline and performance criteria to measure improvement in behavior and identifies intervention strategies. *Id.* §§ 200.1(mmm), 200.22(b); *see also* 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i).
>
> For students with autism, Committees shall include provisions for parent counseling and training. NYCRR §§ 200.1(kk); 200.13(d).
>
> Committees "shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 29 U.S.C. § 1414(e); *see also* 34 C.F.R. § 300.501(c)(1).

"If a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state."

*Frank G.*, 459 F.3d at 363.

6

The Supreme Court has established the three-pronged *Burlington/Carter* Test to determine eligibility for reimbursement, which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities. *Id.* In order to challenge an IEP, parents must first file a "due process complaint" listing the alleged deficiencies. 20 U.S.C. § 1415(b)(7)(A). If, after a 30-day resolution period, the deficiencies remain, the parents and school district shall enter into an "impartial due process hearing" as provided by state law. *Id.* § 1415(f)(1). Under New York law, the parties first proceed before an IHO, who is subject to review by an SRO who may affirm or modify the IHO's order. N.Y. Educ. Law § 4404(1), (2). "Either party may then bring a civil action in state or federal court to review the SRO's decision." *R.E.*, 694 F.3d at 175 (citing 20 U.S.C. § 1415(i)(2)(A)).

**II. C.F.**

C.F., now eleven years old, is autistic and presents with significant interfering behaviors including maladaptive and self-stimulatory behaviors. Before the 2006-2007 school year, C.F. was on a home-based applied behavioral

7

analysis ("ABA") program.[3] For the 2006-2007 and 2007-2008 school years, C.F. attended McCarton, a private school located in Manhattan, where he received ABA therapy at a 1:1 student-to-therapist ratio. In July 2007, C.F. and his parents moved from New Jersey into New York City. On May 15, 2008, the Department convened a Committee on Special Education (the "Committee") to formulate C.F.'s IEP for the 2008-2009 school year. The Committee was comprised of the following individuals: C.F.'s father; Nicole Check, a Department psychologist; a Department social worker; a Department special education teacher; a speech therapist; C.F.'s at-home ABA provider; and a parent member. The Committee considered a classroom observation report and social history report prepared by a Department social worker. It also considered information that had been previously prepared by McCarton personnel: a psycho-educational evaluation, a neuro-developmental evaluation and educational, occupational therapy, and speech and language progress reports.

Neither the Committee nor the IEP specified the school placement site. However, on June 17, 2008, the Department sent Plaintiffs a final notice of recommendation, placing C.F. at PS 169 located at PS 102, starting in July 2008.

_____

[3] ABA is the use of principles and techniques in order to encourage useful behaviors and discourage harmful ones.

C.F.'s IEP was attached to the notice. The IEP recommended placement in a 6:1:1 student-to-teacher-to-paraprofessional ratio classroom. The Committee also recommended five 30-minute sessions per week of speech and language therapy at a 1:1 student-to-therapist ratio and five 30-minute sessions per week of occupational therapy at a 1:1 student-to-therapist ratio. The Committee did not create a functional behavioral assessment but did create a behavioral intervention plan based on the McCarton reports.

On June 27, 2008, C.F.'s parents sent a letter rejecting the proposed placement. C.F. was enrolled in McCarton for the 2008-2009 school year and received after-school 1:1 ABA therapy. On June 30, 2008, Plaintiffs filed the required due process complaint, the relevant portion of which is reproduced below in a footnote.[4] At the end of the 30-day resolution period, Plaintiffs

---

[4] The due process complaint alleged, *inter alia*:

A specific and identifiable placement was not timely and properly developed and determined at the IEP meeting, with the active involvement of [C.F.'s] parents, as required by statute. The IEP merely reflects the generic recommendation "special class in a specialized school";

. . .

Although [C.F.] is diagnosed with an autism spectrum disorder, the [Department] failed to make provision for appropriate,

proceeded to a hearing before an IHO.

**III. Case History**

Before the IHO, the Department put forth four witnesses. The first, Department psychologist Check, testified to the following: She had developed C.F.'s behavioral intervention plan after the Committee meeting, based on reports from McCarton and C.F.'s treatment providers. She did not develop a functional behavioral assessment. The behavioral intervention plan included target behaviors and supports to remediate behaviors. It did not, however, identify supports for specific behaviors. Check agreed that the plan was "vague, based on the standards in the field," but stated that it would be made more specific

---

individualized parent training and counseling, in violation of the [Commissioner of Education's] express regulations;

. . .

Although [C.F.] presents with a variety of interfering behaviors, the [Department] failed to make any provision at the IEP for the appropriate development of a Functional Behavioral Assessment ("FBA") or appropriate Behavior Intervention Plan ("BIP") that is supposed to be based on the results of such an assessment—the so-called BIP attached to [C.F.'s] proposed IEP is inappropriate and inadequate[.]

The complaint requested that C.F. continue his education at McCarton and that his parents be provided with parent training and counseling.

once C.F. was placed. Finally, she stated that while the Committee recommended that C.F. attend a 6:1:1 program, it was her understanding that some Department classrooms utilized 1:1 ABA therapy.

The second witness, Denise Velasquez, the parent coordinator at PS 169, testified about her duties assisting parents with autistic students. She testified that she conducted workshops for parents with autistic children, and that such workshops were usually offered monthly, with eight total for the year.

The third witness, Ilene Halpern, was the assistant principal at PS 169 at PS 102, C.F.'s proposed placement. She testified that, while C.F.'s proposed placement started in July, the site was not ready until September. Prior to that time, PS 169 was located in a nearby location at PS 155. Halpern testified that, had a parent attempted to visit PS 169 at PS 102 in July, the parent would have been directed to PS 155.

The final Department witness, Stephanie Silverman, a special education teacher at PS 169, testified about her classroom. She stated that she had previously taught in a 6:1:1 classroom that used ABA as well as another teaching method, TEACCH.[5] She testified that, were C.F. to have been placed in her

---

[5] TEACCH stands for Treatment and Education of Autistic and Related Communication-Handicapped Children.

classroom, she would have been able to conduct a functional behavioral assessment and behavioral intervention plan, based on her classroom observations. She also opined that, based on the IEP, C.F. would have fit into her class. With regard to parent training and counseling, Silverman testified that she holds parent-teacher conferences and is open to meeting with parents.

Plaintiffs put forth eight witnesses. Five were affiliated with McCarton. First, Panos Rekoutis, acting director of occupational therapy at McCarton, testified that the severity of C.F.'s maladaptive behaviors required individualized occupational therapy sessions, and that C.F. was receiving five 45-minute sessions per week at McCarton. Adina Haims, a speech and language pathologist at McCarton, testified that C.F. required individualized speech and language therapy due to his lack of attention and focusing capacity, and that he received five 60-minute speech therapy sessions weekly at McCarton. She further testified that 30-minute sessions would not give C.F. enough time to control his behaviors. Jessica Pangretic, a speech therapist at McCarton, testified to the contents of C.F.'s speech therapy sessions, and also testified that 30-minute speech therapy sessions would be inappropriate. Ivy Feldman, education director at McCarton, testified that, due to C.F.'s maladaptive behaviors, he

required a 1:1 learning environment, and that a 6:1:1 setting would be inappropriate. Marva Pearl, a teacher at McCarton, testified as to C.F.'s improvement in behavior in a 1:1 ABA classroom during the 2007-2008 and 2008-2009 school years.

Additionally, G.F., C.F.'s mother, stated that her son had made meaningful progress while at McCarton, including improvements with language and fine motor skills. She also testified that C.F. received after-school speech and language and ABA services. Jenifer Clark, behavior consultant and senior supervising therapist for the ABA services, testified that C.F. would not make meaningful progress in a 6:1:1 classroom. She also testified that C.F. needed both home and school services. Finally, R.F., C.F.'s father, testified that C.F. had made progress at McCarton and that he did not believe that his son could make meaningful progress in a 6:1:1 class. He stated that, after the family moved to New York City, he had asked whether the City had programs akin to McCarton's, and further inquired whether there was an option by which C.F. could remain in McCarton and receive financial assistance, but he received no definitive response. He testified that, after the final notice of recommendation, he attempted to contact C.F.'s placement school through phone calls and letters, but

13

was unable to do so. Finally, R.F. testified that, after the Committee meeting, he had enrolled C.F. in McCarton for the 2008-2009 school year.

IHO Nancy Lederman held that Plaintiffs were entitled to reimbursement under *Burlington/Carter*. With respect to the first element of the Test, she held that the Department failed to provide C.F. with a free appropriate public education. She based her determination on the following: C.F.'s placement in a school site not open until September and R.F.'s inability to make contact with anyone at the placement site; the failure to create an individualized program for C.F. based on the severity of his behavior and unanimous testimony by parent witnesses that C.F. required a 1:1 placement; the vagueness of the behavioral intervention plan and the failure to produce a functional behavioral assessment; and the failure to provide parent training or counseling. With respect to Plaintiffs' placement at McCarton, the IHO credited the detailed testimony of the five McCarton witnesses and held that the placement was appropriate. Finally, considering the equities, the IHO held that Plaintiffs had cooperated with the Department and therefore were entitled to reimbursement.

The Department appealed to SRO Paul Kelly, who reversed the IHO's decision. The SRO held that, with regard to step one of *Burlington/Carter*, the

14

Department had provided C.F. with a free appropriate public education. He held that the issue of C.F.'s school placement site was foreclosed because Plaintiffs failed to challenge it in the due process complaint. The SRO held that the functional behavioral assessment and behavioral intervention plan were appropriate in light of the testimony of Department school psychologist Check and special education teacher Silverman that C.F. would have received a more complete plan at his placement site. With respect to the dispute over the 6:1:1 class placement, the SRO focused on C.F.'s behavioral needs and goals, as described in the various reports considered by the Committee. The SRO placed particular emphasis on the testimony of special education teacher Silverman, who testified as to how she would address C.F.'s behavioral goals and her practice of providing 1:1 instruction as needed. Finally, based on the testimony of Department parent coordinator Velasquez as to services provided, the SRO held that the Department provided sufficient parent training and counseling. Because the SRO found for the Department in step 1, it declined to reach the other steps of *Burlington/Carter*.

Plaintiffs appealed to the district court, which affirmed the SRO's decision. *C.F. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 00157(LTS), 2011 WL 5130101 (S.D.N.Y.

15

Oct. 28, 2011). With respect to the dispute over the 6:1:1 placement, the district court held that the issue was foreclosed because it was not raised in the due process complaint. Plaintiffs now appeal.

## DISCUSSION

Plaintiffs sue seeking tuition reimbursement for the 2008-2009 school year under the IDEA. Their claim is governed by the *Burlington*/*Carter* Test, which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities. *Frank G.*, 459 F.3d at 363. Under New York law, at the due process hearing, the Department bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement. N.Y. Educ. Law § 4401(1)(c).[6]

"The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-13 (2d Cir. 2007) (internal quotation marks omitted). The standard of

---

[6] We need not here decide whether this state-imposed burden also applies during the federal suit. *See R.E.*, 694 F.3d at 184-85 n.2.; *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 225 n.3 (2d Cir. 2012).

review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (internal quotation marks, ellipses, and brackets omitted). The deference owed depends on both the quality of the opinion and the court's institutional competence.[7] *Id.* Under our deferential review, "[w]here the IHO and SRO disagree," we "defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* at 246. However, where the SRO's determinations are insufficiently reasoned to merit deference, the courts should defer to the IHO's analysis. *Id.* at 246, 252.

---

[7] In our recent decision in *M.H.* we gave several examples:

> By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

685 F.3d at 244 (internal citations omitted).

Additionally, the courts should defer to the IHO's analysis when considering an issue not reached by the SRO. *Id.* at 252. We review the district court de novo. *Gagliardo*, 489 F.3d at 112.

On appeal, Plaintiffs allege that the Department denied C.F. a free appropriate public education because it failed to include C.F.'s parents in school site selection; failed to make express provisions for parent counseling and training; failed to develop a functional behavioral assessment or adequate behavioral intervention plan; and failed to offer an individualized placement that addressed C.F.'s demonstrated need for a 1:1 classroom. They also argue that McCarton was an appropriate private placement and that the equities favor them.

Upon review, we hold that, under *Burlington/Carter*, C.F.'s parents are entitled to tuition reimbursement, and we therefore vacate the order of the district court and remand for further proceedings consistent with this opinion.

**I. The Department's IEP**

**A. Plaintiffs' Due Process Complaint**

The first element of the *Burlington/Carter* Test looks to whether the school district's proposed plan will provide the child with a free appropriate public

education.  Before reaching the merits of Plaintiffs' allegations in that regard, we must consider whether any issues are foreclosed from review, as both the SRO and district court held that some of the allegations were foreclosed because they were not pled in the due process complaint.

As explained above, parents must file a due process complaint in order to allege deficiencies in an IEP.  20 U.S.C. § 1415(b)(7)(A).  After the filing of such a complaint, the Department has a 30-day resolution period in which to remedy any deficiencies.  *Id.* § 1415(f)(1).  The Department cannot be expected to resolve problems of which it is unaware.  Accordingly, "[t]he parents must state all of the alleged deficiencies in the IEP in their initial due process complaint in order for the resolution period to function."  *R.E.*, 694 F.3d at 187 n.4.  The IDEA further provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [complaint], unless the other party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B).  District courts in this circuit have held that issues not raised in due process complaints are foreclosed from review in federal court, absent agreement from the opposing party.  *See, e.g.*, *E.F. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2217 (MKB),

19

2013 WL 4495676, at * 17 (E.D.N.Y. Aug. 19, 2013); *Dirocco v. Bd. of Educ.*, No. 11 Civ. 3897(ER), 2013 WL 25959, at *23 (S.D.N.Y. Jan. 2, 2013).

We hold that the waiver rule is not to be mechanically applied. The key to the due process procedures is fair notice and preventing parents from "sandbag[ging] the school district" by raising claims after the expiration of the resolution period. *See R.E.*, 694 F.3d at 187 n.4. We note that the IDEA itself contemplates some flexibility. The statute does not require that alleged deficiencies be detailed in any formulaic manner, *see* 20 U.S.C. § 1415(b)(7)(A)(ii), and the waiver rule limits only what may be raised "at the due process hearing," *id.* § 1415(f)(3)(B); *see also* 34 C.F.R. § 300.511(d).

Here, in their due process complaint, Plaintiffs provided fair notice to the Department of their claim concerning the lack of availability of the proposed site prior to September. They alleged in their due process complaint that a "specific and identifiable placement was not timely and properly developed and determined at the time of the IEP meeting." The allegation that the Department had failed to provide a specific and identifiable placement in a timely manner surely encompasses the claim that the placement was not timely because the designated school site was unavailable until some two months after the

20

placement was to begin. Moreover, the issue of the unavailability of the proposed site until September *was* raised at the hearing—by one of the Department's witnesses. It was only then that Plaintiffs learned of the delayed availability of the placement. That claim, therefore, was properly raised before both the SRO and the district court.

The district court also held that Plaintiffs' allegation that the Department failed to consider a 1:1 staffing ratio, instead considering only a 6:1:1 ratio, was foreclosed. This too was error. With respect to this claim, both the IHO and SRO reached the issue on the merits, giving us a record for review. Additionally, the dispute over the staffing ratio directly relates to C.F.'s maladaptive behaviors, which are at the heart of this dispute. The due process complaint plainly alleged that the Department failed to appropriately develop plans for C.F.'s behavior. In addition, the proposed solution was a recommendation that C.F. continue at McCarton, where he would remain in a 1:1 placement. The Department, which relied on McCarton records in making its IEP determinations, was aware of this. Accordingly, the staffing ratio issue is properly considered by the federal courts.

**B. The Merits of Plaintiffs' Claims**

The first element of the *Burlington/Carter* Test has two components. "At the

21

first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." *R.E.*, 694 F.3d at 190 (internal quotation marks omitted). Procedural violations only entitle parents to reimbursement if they "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). Second, courts "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." *R.E.*, 694 F.3d at 190. "Substantive inadequacy automatically entitles the parents to reimbursement." *Id.*

Here, Plaintiffs allege three procedural violations: that the Department denied C.F. a free appropriate public education because it failed to include C.F.'s parents in school site selection; that it failed to develop a functional behavioral assessment or adequate behavioral intervention plan; and that the Department failed to make express provisions for parent counseling and training. Substantively, they allege that the Department ignored uniform evidence that C.F. required a 1:1 placement and instead assigned C.F. to a 6:1:1 placement. Our

22

review is guided by our recent case, *R.E.*, decided after the district court issued its decision in this litigation. In the consolidated appeals in *R.E.*, we considered the appropriateness in IDEA litigation of allowing school districts to supplement an IEP with "retrospective testimony" of services that were not listed in the IEP. 694 F.3d at 185. We held that "an IEP must be evaluated prospectively as of the time it was created." *Id.* at 188. "Retrospective evidence that materially alters the IEP is not permissible." *Id.* On appellate review, we disregard the retrospective testimony improperly relied upon by the SRO and the district court. Considering the remaining evidence, we hold that the Department failed to provide C.F. with a free appropriate public education.

Plaintiffs first allege that the Department erred in failing to include C.F.'s parents in site selection. The record shows that the specific school site was not discussed by the Committee or included in the IEP. Additionally, the recommended placement site, PS 169 at PS 102, was not available until September, despite the fact that C.F.'s placement began in July. The IDEA requires school districts to "ensure that the parents of each child with a disability are members of any group that makes decisions on the *educational placement* of their child." 29 U.S.C. § 1414(e) (emphasis added); *see also* 34 C.F.R.

23

§ 300.501(c)(1).  However, we have interpreted the term "educational placement" to refer to the "general educational program—such as the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school."  *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).  Thus, while the failure to specify a school site may render an IEP substantively inadequate, it does not "constitute a *per se* procedural violation of the IDEA."  *Id.*  Here, the Department complied with the IDEA by including C.F.'s parents in the determination of the *type* of placement, the 6:1:1 placement at a Department school.  While we acknowledge the difficulties that Plaintiffs had in communicating with the school site, these difficulties did not change the type of placement and therefore did not violate the procedures of the IDEA.

Next, Plaintiffs contend that the Department erred in failing to include parent counseling or training in the IEP.  New York law requires school districts to include provisions for parent counseling and training.   NYCRR §§ 200.1(kk); 200.13(d).  Here, the Department failed to do so.  Because the IEP must be evaluated prospectively, without recourse to retrospective testimony, the Department cannot cure such violations by offering testimony that counseling and training would have been offered.  *R.E.*, 694 F.3d at 193.  We also note that

24

the SRO previously held that "parent training and counseling must be identified on the IEP as a related service." *R.K. ex rel. R.K. v. N.Y.C. Dep't of Educ.*, No. 09-CV-4478 (KAM), 2011 WL 1131492, at *20 (E.D.N.Y. Jan. 21, 2011) (internal quotation marks omitted), *report and recommendation adopted by* No. 09-CV-4478 (KAM)(RLM), 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011), *aff'd sub nom. R.E.*, 694 F.3d at 194. Accordingly, we hold that the Department's failure to include such provisions in the IEP was a procedural violation.

Finally, Plaintiffs allege that the Department failed to develop an appropriate functional behavioral assessment or behavioral intervention plan, as required by state law. *See* NYCRR §§ 200.1(r); 200.1(mmm); 200.4(b)(1)(v); 200.22(a); 200.22(b). To the extent that Plaintiffs' claim rests on the Department's failure to produce a functional behavioral assessment, the claim fails. While the omission of a functional behavioral assessment "cause[s] us to take particular care to ensure that the IEP adequately addresses the child's problem behaviors," the production of such an assessment is not required by the IDEA. *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013) (internal quotation marks omitted). Additionally, even under New York law, assessments are only required "*as necessary* to ascertain the physical, mental, behavioral and emotional

25

factors which contribute to the suspected disabilities." NYCRR § 200.4(b)(1)(v) (emphasis added). Consequently, the state law requirement does not "raise the IDEA bar by rendering IEP's developed without an [functional behavior assessment] legally inadequate." *M.W.*, 725 F.3d at 140.

The focus of our review is the behavioral intervention plan developed by the Department. "The IDEA . . . requires a school district to consider the use of positive behavioral interventions and supports, and other strategies when a child's behavior impedes learning." *Id.* (internal quotation marks omitted). "Failure to conduct [a functional behavior assessment], therefore, does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior." *Id.* Here, we hold that the Department failed to adequately create and implement behavioral strategies in its behavioral intervention plan. The plan failed to match strategies with specific behaviors, instead simply listing behaviors and strategies. Department psychologist Check admitted that the plan was vague compared to standards in the field. The failure to produce an appropriate behavioral intervention plan was the procedural

26

violation. The lack of a functional behavioral assessment is relevant only to the extent that it led to this failure.

Before the IHO, the Department offered evidence, based on testimony by Check and by special education teacher Silverman, that a functional behavioral assessment and more specific behavioral intervention plan would be created in C.F.'s placement classroom. However, such evidence cannot be offered retrospectively to cure errors in an IEP or its documents. *See R.E.*, 694 F.3d at 186-87. Additionally, to the extent that the Department relies on Silverman's testimony, " [t]he prospective nature of the IEP also forecloses the school district from relying on evidence that a child would have had a specific teacher or specific aide." *Id.* at 187.

Having considered Plaintiffs' allegations of procedural violations, we hold that the Department erred in failing to provide for parent training and counseling and in producing an inappropriately vague behavioral intervention plan without producing a functional behavioral assessment. Such violations only satisfy the first element of the *Burlington*/*Carter* Test if they, individually or cumulatively, "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process,"

27

or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). Here, rather than consider the procedural violations in isolation, we next consider Plaintiffs' alleged substantive inadequacy. "The initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009). Consequently, the presence or absence of procedural violations informs our determination of substantive adequacy.

Plaintiffs allege that the Department's IEP is substantively inadequate because the Department failed to consider a 1:1 ratio placement classroom, despite overwhelming evidence that C.F. required one, and instead placed C.F. in a 6:1:1 ratio classroom. We agree and hold that the failure to consider a 1:1 classroom resulted in the denial of a free appropriate public education.

We make this determination for several reasons. First, before the IHO, all witnesses familiar with C.F. testified that he required a 1:1 placement. This testimony went unrebutted by Department witnesses, except for testimony by Department special education teacher Silverman that C.F. would fit in her

28

classroom. Second, while Check and Silverman testified that placement classrooms incorporated 1:1 ABA principles, this was, as discussed above, improper retrospective testimony. Finally, the issue of classroom placement ratio cannot be separated from one of the procedural violations discussed above, namely, the Department's failure to conduct an appropriate functional behavioral assessment or behavioral intervention plan. Witnesses who recommended a 1:1 placement did so out of concerns relating to C.F.'s maladaptive behaviors. The failure to consider such concerns is related to the failure to properly draw up a plan to account for those behaviors.

The IEP's substantive inadequacy, therefore, is rooted in the testimony and reports indicating that C.F.'s behavioral needs required a 1:1 placement. As the IHO found, such instruction should have been considered as a necessary component of any plan "reasonably calculated to enable the child to receive educational benefits." *R.E.*, 694 F.3d at 190 (internal quotation marks and brackets omitted). As we noted earlier, this is not because the IDEA requires that a child be provided with the optimal educational program, but rather due to the overwhelming testimony that 1:1 instruction was necessary in C.F.'s case. The Department's offer of a 6:1:1 placement instead, particularly when combined

29

with the IEP's failure to produce an adequate, individualized functional behavioral assessment or behavioral intervention plan and the lack of any provision for parent counseling and training, thus denied C.F. a free appropriate education. *See M.H.*, 685 F.3d at 252 (relying on an IHO opinion that the IEP was inadequate, in part, for its failure to account for evidence suggesting a need for intensive 1:1 instruction). The SRO's reliance on retrospective testimony cannot cure the failures of the IEP itself, which must allow parents "to make an informed decision as to its adequacy prior to making a placement decision." *R.E.*, 694 F.3d at 186.

**II. The Plaintiffs' Unilateral Placement at McCarton**

C.F.'s parents' unilateral placement at McCarton must be appropriate in order for them to be entitled to reimbursement. While the private placement does not need to meet the specific standards of the IDEA or state law, "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement." *Frank G.*, 459 F.3d at 364. "Ultimately, the issue turns on whether a placement—public or private—is

reasonably calculated to enable the child to receive educational benefits." *Id.*

(internal quotation marks omitted).

Neither the SRO nor the district court reached this issue. We therefore look

to the opinion of the IHO. *See M.H.*, 685 F.3d at 252 ("In this case, the SRO did

not reach the [second element under the *Burlington/Carter* Test]. The district

court therefore deferred to the IHO, whose conclusions the court found to be well

reasoned and supported by the evidence." (internal quotation marks omitted)).

The IHO held, based on the testimony of the McCarton witnesses, that the school

was an appropriate placement. "The IHO's determination was based on his

assessment of the credibility of the witnesses testifying before him, and his own

understanding of educational methodology." *M.H.*, 685 F.3d at 258. "It was

entitled to deference on that basis." *Id.* Additionally, we note that C.F. attended

McCarton for the year prior to the year at issue in this appeal, and further note

that the Department itself relied on McCarton reports in formulating its IEP.

Accordingly, we hold that the second element of the *Burlington/Carter* Test favors

Plaintiffs.

## III. A Consideration of the Equities

Finally, in order to be entitled to reimbursement, "equitable considerations relating to the reasonableness of the action taken by the parents," must also favor Plaintiffs. *Frank G.*, 459 F.3d at 363-64 (internal quotation marks and brackets omitted). As neither the SRO nor the district court reached this issue, we again look to the opinion of the IHO. The IHO credited the testimony of R.F.'s father that he had attempted to find a 1:1 placement program within the Department; that he attempted to make contact with C.F.'s Department placement site; and that he did not make plans to enroll C.F. in McCarton until after the Committee met. As the Department failed to provide for parent training and counseling, produced an inappropriately vague behavioral intervention plan, and failed to consider a 1:1 ratio classroom placement despite overwhelming evidence C.F. required one, and as the parents' private placement was appropriate to C.F.'s needs, we agree with the IHO's determination that the equities did not weigh against Plaintiffs. We therefore hold that the third element of *Burlington/Carter* favors Plaintiffs.

32

**CONCLUSION**

For the foregoing reasons, the order of the district court is VACATED and this case is REMANDED.  On remand, the district court is directed to enter judgment in the appropriate amount in favor of Plaintiffs.