**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: September 10, 2015          Decided: January 20, 2016)

Docket No. 14-3078-cv

_____

T.K. and S.K., individually and on behalf of L.K.,

*Plaintiffs-Appellees*,

v.

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellant*.

_____

Before:

LYNCH, LOHIER, and CARNEY, *Circuit Judges*.

The New York City Department of Education (the "Department") appeals from a judgment of the United States District Court for the Eastern District of New York (Weinstein, J.) awarding Plaintiffs T.K. and S.K. reimbursement for one year of private school education for their daughter, L.K. The District Court held that that the Department denied L.K. the free appropriate public education required by the Individuals with Disabilities Education Act because the Department refused to address Plaintiffs' reasonable concerns about the severe bullying that L.K. endured in public school. Because we agree that the Department denied L.K. a free appropriate public education, that L.K.'s private school placement was appropriate, and that the equities favor Plaintiffs, we AFFIRM.

GARY S. MAYERSON (Jean Marie Brescia, *on the brief*), Mayerson & Associates, New York, NY, *for* Plaintiffs-Appellees.

RONALD E. STERNBERG (Richard P. Dearing, *on the brief*), *for* Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, *for* Defendant-Appellant.

James Cole, Jr., General Counsel, Francisco Lopez, Vanessa Santos, Michelle Tucker, Attorneys, U.S. Department of Education, Office of General Counsel, Washington, DC; Vanita Gupta, Acting Assistant Attorney General, Mark L. Gross, Jennifer Levin Eichhorn, Attorneys, U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, *for* United States as Amicus Curiae supporting Plaintiffs-Appellees.

LOHIER, <u>Circuit Judge</u>:

The New York City Department of Education (the "Department") appeals from a judgment awarding Plaintiffs T.K. and S.K. reimbursement under the Individuals with Disabilities Education Act ("IDEA" or the "Act") for one year of private school education for their daughter, L.K, who was the

subject of severe bullying. On appeal we consider whether the Department violated the IDEA by denying Plaintiffs' requests to discuss L.K.'s bullying despite their reasonable concern that the bullying interfered with L.K.'s ability to receive a free appropriate public education, also known as a "FAPE." We conclude that the Department's refusal to discuss the bullying of L.K. with her parents during the process of developing L.K.'s "individualized education program," or "IEP," violated the IDEA. Because Plaintiffs have also met their burden to show that their choice of a private placement for L.K. was appropriate and that the equities favored reimbursing them, we affirm the judgment of the District Court.

## BACKGROUND

### I. L.K.'s Public School Experience and Private School Placement

The following undisputed facts are drawn from the record on appeal. L.K. is a child with a disability under the IDEA. She spent her third-grade year (2007-2008) in a public school operated by the Department. At the school, she was placed in a "Collaborative Team Teaching" class, which included general and special education students and which was taught by both a general and a special education teacher. The Department also

provided L.K. with one-on-one "Special Education Itinerant Teachers" ("SEITs").

Academically, L.K. made "progress throughout the school year" and performed at or approaching grade level in all subjects. But at a certain point L.K.'s schoolmates bullied her so severely that she came home crying and complained to her parents about the bullying on a near daily basis. L.K.'s three SEITs testified that her classmates constantly bullied her. One SEIT even described the classroom as a "hostile environment" for L.K. A neuro-developmental pediatrician found that the "minimal interactions" L.K. had with her classmates "were mostly negative."

The witnesses supported these generalized assessments by describing specific instances of bullying. In May and November 2007 one student pinched L.K. hard enough to cause a bruise and stomped on her toes. Her classmates ostracized her, backing away from her to avoid touching her. In one instance, they refused to touch a pencil, treating it as contaminated merely because L.K. had touched it. At other times they pushed L.K. away; tripped her; laughed at her; and called her "ugly," "stupid," and "fat." One student drew a demeaning picture of her and another made a prank phone

4

call to her home.

L.K.'s teachers appear to have done little to stop the bullying. For example, when L.K.'s classmates refused to touch the pencil that she had touched, one of her classroom teachers foolishly reinforced their behavior by labeling the pencil with L.K.'s name, purportedly because of L.K.'s poor hygiene. When L.K. was tripped, a teacher berated L.K. for "making a scene." Two of L.K.'s SEITs explained that the classroom teachers ignored their concerns about L.K.'s bullying. The neuro-developmental pediatrician observed that L.K.'s teachers neither intervened nor punished the students who bullied her.

It appears from the record that the bullying affected L.K.'s academic and non-academic development. Her father described her as "emotionally unavailable to learn" as a result of the bullying, and his assessment was supported by other facts in the record. L.K. was late to school sixteen times in the spring semester due, the Plaintiffs claim, to her fear of interacting with her classmates. She brought dolls to school for support. One of her SEITs reported that bullying negatively affected L.K.'s "ability to initiate, concentrate, attend and stay on task with her homework assignments and

activities after school." She volunteered less in class. And she counted the days until the end of the school year, when she might temporarily escape her tormentors.

Plaintiffs' several attempts to raise the issue of bullying with L.K.'s school were consistently rebuffed. Without avail, they requested copies of any incident reports involving harassment of L.K. They wrote to teachers and administrators about L.K.'s bullying, but received no response. The school's stonewalling continued even during the process of developing L.K.'s IEP, which is the central mechanism by which the IDEA ensures that States comply with its provisions. At a meeting on March 26, 2008, to develop L.K.'s behavior intervention plan (a plan to be used in developing the IEP), L.K.'s parents "attempted to raise the bullying issue," but the school principal, without explanation, flatly refused to discuss the issue with them. Joint App'x 6799. And at the IEP team meeting on June 4, 2008, L.K.'s parents tried to revisit the bullying issue, but school officials again refused to discuss bullying, contending that it was an inappropriate topic to consider when developing L.K.'s IEP.

Plaintiffs decided to place L.K. in a private school rather than risk

another year of bullying. On March 21, 2008, prior to the development of L.K.'s behavior intervention plan or IEP, Plaintiffs signed an enrollment contract with The Summit School ("Summit"), a private school for students classified as learning disabled.[1] They also made a non-refundable one-month tuition payment to Summit to reserve L.K.'s seat for the following school year. On June 6, 2008, two days after the development of L.K.'s IEP, Plaintiffs notified the Department that they were rejecting L.K.'s IEP in favor of a private placement.

II. Procedural History

Later in June 2008 Plaintiffs started a New York State administrative action seeking reimbursement for L.K.'s 2008-2009 tuition for Summit, arguing, among other things, that the Department violated the IDEA by refusing to discuss their concerns about L.K.'s bullying. They lost at both levels of administrative review: first before the Initial Hearing Officer (IHO) and then before the State Review Officer (SRO).

Plaintiffs next appealed to the United States District Court for the Eastern District of New York (Weinstein, J.). Concluding that students have

---

[1] L.K. was initially diagnosed with Autism Spectrum disorder but, at Plaintiffs' request, was reclassified as "learning disabled".

the "right to be secure" in school and that significant, unremedied bullying could constitute the denial of a FAPE, the District Court developed a four-part test to determine whether bullying resulted in the denial of a FAPE: (1) was the student a victim of bullying; (2) did the school have notice of substantial bullying of the student; (3) was the school "deliberately indifferent" to the bullying, or did it fail to take reasonable steps to prevent the bullying; and (4) did the bullying "substantially restrict" the student's "educational opportunities"? 779 F. Supp. 2d 289, 316, 318 (E.D.N.Y. 2011). The court remanded the case to the IHO to consider Plaintiffs' claims under that test. Plaintiffs again lost before the IHO and the SRO and again appealed to the District Court, which granted summary judgment in Plaintiffs' favor.[2] Among other things, the District Court held that the Department's refusal to permit Plaintiffs to discuss bullying in the development of L.K.'s IEP violated the IDEA. 32 F. Supp. 3d 405, 426-27 (E.D.N.Y. 2014). Because the District Court also held that Summit was an appropriate placement and that the equities favored reimbursement, it entered judgment in favor of Plaintiffs.

---

[2] Although the parties style the procedure to dispose of IDEA actions as a motion for "summary judgment," the "procedure is in substance an appeal from an administrative determination." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 226 (2d Cir. 2012).

The Department timely appealed.

**DISCUSSION**

In this appeal, we consider principally whether the Department denied L.K. a FAPE by refusing to discuss bullying with her parents despite their reasonable concern that the severe bullying that L.K. endured could prevent her from receiving a FAPE. We hold that the Department denied L.K. a FAPE by refusing to discuss an issue that, as we note below, it acknowledges may substantially interfere with a child's learning opportunities. Because Plaintiffs have also met their burden to show that their choice of private placement for L.K. was appropriate and because the equities favor reimbursement of their private school tuition, we affirm the judgment of the District Court.

I.  <u>Standard of Review</u>

We review <u>de novo</u> a district court's award of summary judgment in an IDEA case.  <u>C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.</u>, 746 F.3d 68, 77 (2d Cir. 2014).  With respect to state administrative decisions, we engage in an independent, but circumscribed, review, "more critical . . . than clear-error review but . . . well short of complete <u>de novo</u> review."  <u>Id.</u> (quotation marks

omitted).  We give "due weight" to the state proceedings, affording particular deference where "the state hearing officers' review has been thorough and careful."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 240-41 (2d Cir. 2012) (quotation marks omitted).  We are also mindful that federal courts lack "the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  Id. at 240 (quotation marks omitted).

II.  Legal Background

The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education."  20 U.S.C. § 1400(d)(1)(A).  In practice, this means that States have an affirmative obligation to provide a basic floor of opportunity for all children with disabilities or, as we recently described it, an education "likely to produce progress, not regression," and one that "afford[s] the student with an opportunity greater than mere trivial advancement."  M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 239 (2d Cir. 2015).  The "centerpiece" of the IDEA and its principal mechanism for achieving this goal is the IEP.  Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (quoting Honig

v. Doe, 484 U.S. 305, 311 (1988)).  The IEP is a written document that must include the child's present level of performance, goals for her improvement, and a plan about how to achieve that improvement.  See 20 U.S.C. § 1414(d); R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012).  Where the IEP is substantively deficient, parents may unilaterally reject it in favor of sending their child to private school and seek tuition reimbursement from the State. See 20 U.S.C. § 1412(a)(10)(C)(ii); Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006).

Even when an IEP itself is not deficient, parents may seek reimbursement for a unilateral placement if the State fails to afford them certain procedural safeguards.  Of particular importance here, the IDEA requires States to provide parents with the "opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child."  20 U.S.C. § 1415(f)(3)(E)(ii).  Not every violation of these procedural safeguards rises to the level of the denial of a FAPE.  Rather, the violations must "significantly impede[]" the parents' participation rights, "impede[] the child's right to a [FAPE]," or "cause[] a deprivation of educational benefits." Id.  Nor will every denial of a FAPE based on the violation of procedural

safeguards or the substantive inadequacy of the IEP necessarily support a claim for tuition reimbursement. In each case, after determining that a FAPE has been denied, we look to "whether the parents' private placement is appropriate to the child's needs[] and . . . [to] the equities." C.F., 746 F.3d at 73; see also Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 13-16 (1993); Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369-70 (1985). Under New York law, "the Department bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement." C.F., 746 F.3d at 76 (citing N.Y. Educ. Law § 4404(1)(c)).

III. The Department's Denial of a FAPE

We have not previously addressed whether the bullying of a student with a disability is an appropriate consideration in the development of an IEP and can result in the denial of a FAPE under the IDEA. Because the Department concedes that it can be an appropriate consideration when it "reaches a level where a student is substantially restricted in learning opportunities," Department Br. 37 (quotation marks omitted), we assume as

12

much without deciding the issue here.[3] We note, though, that the Department's concession recognizes that a child with a disability who is severely bullied by her peers may not be able to pay attention to her academic tasks or develop the social and behavioral skills that are an essential part of any education.[4] It also accords with the position of the United States as amicus curiae in this appeal and with guidance from the United States Department of Education that bullying can interfere with a disabled student's ability to receive a FAPE.[5] See, e.g., U.S. Dep't of Educ., Office of Special Education and Rehabilitative Services, Dear Colleague: Bullying of Students

---

[3] Because we hold that the Department denied L.K. a FAPE as a result of its procedural violations, we also need not and do not reach the question whether the bullying at issue here was so severe that the failure to address it in L.K.'s IEP resulted in a substantive denial of a FAPE. For the same reason, we express no opinion as to whether the District Court's four-part test for determining when bullying results in the substantive denial of a FAPE correctly states the law.

[4] Even assuming that the IEP need be concerned only with "how the child's disability affects" her academic and functional performance, 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa), we see no reason to doubt that bullying may be sufficiently related to a child's disability to meet any nexus requirement that can reasonably be inferred from the IDEA.

[5] In view of the Department's concession in this case, we need not decide the precise level of deference owed to the position outlined in the United States' amicus brief or to the other agency guidance supporting that position.

with Disabilities 1 (Aug. 20, 2013), available at

http://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/bullyingdcl-8-20-13.pdf.

We conclude that the Department denied L.K. a FAPE by violating her parents' procedural right to participate in the development of her IEP. At two separate meetings, both of which were integral to the development of L.K.'s IEP, Plaintiffs sought to discuss L.K.'s bullying, but school officials refused to do so. The undisputed record evidence confirms that, in asking to speak with the officials about the bullying, L.K.'s parents had reason to believe that the bullying would interfere with L.K.'s ability to receive meaningful educational benefits and could prevent L.K.'s public education from producing "progress, not regression." M.O., 793 F.3d at 239. For example, one of L.K.'s SEITs reported that bullying negatively affected L.K.'s "ability to initiate, concentrate, attend and stay on task with her homework assignments and activities after school." Joint App'x 6331. There was also undisputed evidence that L.K. dreaded going to school, counted the days until the end of school, and was frequently tardy, arguably due to her fear of being bullied. Indeed, her father described L.K. as "emotionally unavailable to learn" and

14

testified that she came home crying and complained about bullying on a near daily basis. Three of L.K.'s SEITs confirmed that she was constantly teased, excluded from groups, and subjected to a hostile environment. A doctor familiar with L.K. testified that her classroom behavior and demeanor had regressed from the prior year. And given the school's lack of cooperation about the bullying, Plaintiffs could not reasonably be confident that they had been informed about the full scope of the bullying or its effects on L.K.[6] The Department's persistent refusal to discuss L.K.'s bullying at important junctures in the development of her IEP "significantly impede[d]" Plaintiffs' right to participate in the development of L.K.'s IEP. 20 U.S.C. 1415(f)(3)(E)(ii). This constituted a procedural denial of a FAPE similar to other procedural violations that our sister circuits have held to constitute denials of a FAPE, such as the predetermination of an issue prior to an IEP meeting, see Deal v. Hamilton Cty. Bd. of Educ., 392 F.3d 840, 855-59 (6th Cir. 2004), or the failure to inform parents about a fact significant to the development of the IEP, see Amanda J. ex rel. Annette J. v. Clark Cty. Sch.

---

[6] Certain children covered by the IDEA have disabilities that impair their ability to communicate. For parents of children with such disabilities, the responsiveness of school officials could be especially important.

15

Dist., 267 F.3d 877, 892-93 (9th Cir. 2001).

The Department argues that the Plaintiffs suffered no harm, insofar as L.K.'s IEP already addressed bullying by including goals for improving L.K.'s behavior in a manner that might reduce future bullying. It also argues that some anti-bullying strategies are better addressed through channels other than the IEP. We are not persuaded. Denying L.K.'s parents the opportunity to discuss bullying during the creation of L.K.'s IEP not only potentially impaired the substance of the IEP but also prevented them from assessing the adequacy of their child's IEP.

We have recognized in other contexts the procedural importance of the parents' ability meaningfully to evaluate the sufficiency of the IEP before it is finalized. For example, we have explained that school districts defending the adequacy of an IEP must do so with evidence that was available to parents at the time of the IEP's creation. See R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 186 (2d Cir. 2012) ("A school district cannot rehabilitate a deficient IEP after the fact."). Here, Plaintiffs were reasonably concerned that bullying severely restricted L.K.'s educational opportunities, and that concern powerfully informed their decisions about her education. By refusing to discuss that

bullying during the development of the IEP, the Department significantly

impeded Plaintiffs' ability to assess the adequacy of the IEP and denied L.K. a

FAPE.

IV. Summit Was An Appropriate Placement

Having determined that L.K. was denied a FAPE, we now address

whether reimbursement was appropriate — that is, whether Plaintiffs also

demonstrated that (1) their private placement of L.K. was appropriate and (2)

the equities favored reimbursement.  Both elements are satisfied here.

A private placement is appropriate if it is "reasonably calculated to

enable the child to receive educational benefits," C.F., 746 F.3d at 82

(quotation marks omitted), "such that the placement is likely to produce

progress, not regression," C.L., 744 F.3d at 836 (quotation marks omitted).  In

determining whether a placement reasonably serves the educational needs of

a child with a disability and is likely to produce progress, we consider the

totality of the evidence, including "grades, test scores, regular advancement,

or other objective evidence."  Id.; see also Gagliardo v. Arlington Cent. Sch.

Dist., 489 F.3d 105, 112 (2d Cir. 2007).  The test for the private placement "is

that it is appropriate, and not that it is perfect." C.L., 744 F.3d at 837

(quotation marks omitted).  Parents bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE because "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a [FAPE]."  Frank G., 459 F.3d at 364.

We conclude that Summit was an appropriate placement.  Plaintiffs sent L.K., who was classified as "learning disabled," to a State-approved school devoted to educating students with learning disabilities.[7]  Plaintiffs were advised by a private psychologist that L.K. needed "a more supportive academic environment" in "a small, special education class and school for children with solid cognitive potential who need a supportive and specialized approach for learning."  Summit proved to be a successful match for L.K.  Indeed, the IHO and the SRO found that L.K. made progress "across the board" there, both academically and behaviorally.

However, believing that the failure to include multiple services that

---

[7] New York State lists The Summit School as among the schools to which it has approved private placements for students with disabilities.  See Joint App'x 6141; N.Y. State Educ. Dep't, 853 Programs Serving Students with Disabilities, http://www.p12.nysed.gov/specialed/privateschools/853-statewide.htm (last updated April 17, 2015).

were properly recommended in an IEP necessarily renders a private placement inappropriate, both the SRO and the IHO ultimately concluded that Summit was not an appropriate placement because it offered L.K. inadequate physical therapy, occupational therapy, speech therapy, and counseling services. This was error. "[P]arents need not show that a private placement furnishes every special service necessary to maximize their child's potential." Frank G., 459 F.3d at 365. "They need only demonstrate that the placement" is "reasonably calculated to enable the child to receive educational benefits." Id. at 364-65. As verified by the totality of the record evidence and the findings of the IHO and SRO themselves, L.K's progress at Summit amply satisfies Plaintiffs' burden to prove that Summit was "reasonably calculated to enable [L.K.] to receive educational benefits." C.F., 746 F.3d at 82 (quotation marks omitted).

V. The Equities Favor Reimbursement

Echoing the conclusions of the IHO and the SRO, the Department also contends that the equities in this case do not favor Plaintiffs because Plaintiffs "appeared intent on sending [L.K.] to the private school prior to and at the . . . meeting" where they developed the IEP. In support of this contention, the

Department points out that Plaintiffs (1) paid Summit a deposit of one month's tuition prior to the IEP meeting, (2) "rejected the IEP's recommended . . . placement prior to the start of the 2008-09 school year," and (3) refused to allow the Department to conduct evaluations of L.K. prior to the June 2008 meeting.

We reject these arguments and conclude, as did the District Court, that the balance of equities favors Plaintiffs. As an initial matter, our review of the record confirms the District Court's view that Plaintiffs consistently made good-faith efforts to resolve L.K.'s bullying problem at her public school, and generally cooperated with the Department in the development of L.K.'s IEP. Cf. C.L., 744 F.3d at 840 ("Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA."). The record gives no sense that prior to the Department's refusal to resolve the bullying the parents were anything less than fully committed to a public school education for L.K. Moreover, Plaintiffs promptly notified the Department of their intention to place L.K. at Summit after they received the IEP. Ultimately, their decision to place L.K. at Summit, rather than in public school, reflects a good-faith effort to find an

appropriate placement for their daughter, not just a mere preference for a private school environment.

Nor are we persuaded that Plaintiffs engaged in any form of misconduct merely by making a precautionary private school deposit prior to the meeting with public school officials during which the IEP was developed. Summit required Plaintiffs to put down a deposit long before that meeting, and waiting would have imperiled their ability to secure a spot for L.K in the event that their concerns about bullying remained unaddressed. Moreover, we agree with the District Court that, to the extent that Plaintiffs had an adversarial relationship with school officials, the IHO and SRO overlooked the fact that the same officials shared responsibility for that relationship by ignoring or rebuffing the parents' repeated attempts "to raise their concerns about bullying with teachers and administrators."

**CONCLUSION**

To summarize, we hold that the Department denied L.K. a FAPE, that Summit was an appropriate placement, and that the balance of equities favors reimbursement. For the foregoing reasons, we AFFIRM the judgment of the District Court.

21