*E.M. v. New York City Department of Education*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: February 5, 2013    Decided: July 11, 2014)

Docket No. 11-1427-cv

_____

E.M., AS PARENT AND NATURAL GUARDIAN OF N.M., AN INFANT,

*Plaintiff-Appellant,*

–v.–

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee.*

_____

B e f o r e:

KEARSE, JACOBS, AND CARNEY, *Circuit Judges.*

_____

Plaintiff-appellant E.M., the parent of a disabled child, brought this action under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (the "IDEA"), asserting that defendant-appellee the New York City Department of Education (the "Department") denied her child the free appropriate public education that the IDEA requires. She seeks direct tuition payment for the 2008-2009 school year to the private school where she unilaterally enrolled her child.

The district court (Batts, *J.*) determined, first, that plaintiff had standing to pursue her claim for direct payment, although she had not paid any tuition to the private school. The district court denied plaintiff's claim on the merits, however, ruling that the Department's proposed Individualized Education Program ("IEP") would have provided plaintiff's child a free appropriate public education. We conclude that: (1) plaintiff has standing to pursue this claim because she is legally obligated to pay tuition to her child's private school, even if that obligation may not be enforced unless and until she is successful in her legal challenge to the Department's proffered IEP; and (2) the district court erred in affirming the decision of the state administrative officer as to the adequacy of the IEP, because the officer impermissibly relied on retrospective evidence extrinsic to the IEP in assessing the adequacy of the educational services that would have been provided by the Department. We therefore **VACATE** the judgment in favor of the Department, and **REMAND** the cause to the district court for further proceedings in light of our recent case law concerning the evidence that may be considered in determining the adequacy of an IEP.

———————————

WILLIAM B. ADAMS (Ellison S. Ward, *on the brief*), Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for Plaintiff-Appellant*.

JULIE STEINER (Edward F.X. Hart, G. Christopher Harriss, Brian Reimels, John Buhta, *on the brief*), *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, *for Defendant-Appellee*.

Rebecca C. Shore, New York, NY, *for amici curiae Advocates for Children of New York, Legal Services NYC Bronx, Manhattan Legal Services, New York Lawyers for the Public Interest, Queens Legal Services, and South Brooklyn Legal Services in support of Plaintiff-Appellant*.

———————————

SUSAN L. CARNEY, *Circuit Judge*:

Plaintiff E.M. is a mother with limited financial means who is raising a severely disabled child in New York City. In 2008, E.M. unilaterally withdrew her daughter, N.M., from public school and enrolled her in a private learning center, asserting that the New York City Department of Education (the "Department") failed to provide N.M. with the free appropriate public education that is required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA").[1] Although E.M. has not paid — and is likely unable to pay out-of-pocket — any tuition to the private school, she brought this action against the Department seeking a court order that would direct the Department to pay the private school, retroactively, the amount of her daughter's tuition for the 2008-2009 school year.

This case raises two independent questions: first, whether E.M. has Article III standing to sue the Department under the IDEA for direct, retroactive payment of private school tuition for 2008-2009; and second, whether E.M.'s legal challenges to the Department's proffered Individualized Education Program

---

[1] In 2004, the IDEA was reauthorized and amended by the Individuals with Disabilities Education Improvement Act ("IDEIA"), Pub. L. No. 108-446, 118 Stat. 2647. We continue to refer to the statute, as amended, by the familiar acronym: IDEA.

("IEP") have merit.[2]  We answer the first question in the affirmative.  Although there is reason to believe that the school may not seek to enforce the obligation absent success by E.M. in her IDEA challenge to the Department's IEP, E.M. was legally obligated by the enrollment contract that she signed to pay tuition to the private school.  Contrary to the state hearing officer, we conclude that this legal obligation gives E.M. standing under Article III to pursue her challenge to the IEP and seek direct retroactive tuition payment.  As to the second question, we determine, based on recent Circuit precedent, that because the state administrative officer impermissibly relied on retrospective evidence extrinsic to the IEP in determining that the IEP provided the "free appropriate public education" ("FAPE") required by the IDEA,[3] the district court erred in affirming the state officer's decision.  *See E.M. v. New York City Dep't of Educ.*, No. 09 Civ. 10623 (DAB), 2011 WL 1044905 (S.D.N.Y. Mar. 14, 2011).  The record before us, however, does not permit us to resolve the merits of E.M.'s challenge to the IEP.

---

[2] The decision in this case was held pending the issuance of *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68 (2d Cir. 2014), decided March 4, 2014.

[3] Congress enacted the IDEA "to ensure that all children with disabilities have available to them a *free appropriate public education* . . . designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A)-(B) (emphasis added).

4

We therefore remand the cause to the district court for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background[4]

#### A. N.M.'s Disability and Schooling

N.M. was born in March 2002. She is severely autistic. When she had passed her eighth birthday (in April 2010), she was entirely non-verbal, had a limited attention span, and was prone to self-stimulatory and injurious behaviors, including drumming her fingers on her lips, "spinning" instead of walking in a straight line, and continually poking her eyes. She exhibited potentially harmful "mouthing behaviors," including placing objects like shaving cream and chalk in her mouth. She also faced substantial physical limitations, which required her to use (among other therapies) "fixed ankle foot orthotics" to prevent her calf muscles from shortening. Joint Appendix ("J.A.") at 786.

N.M. began attending a private pre-school called Reach for the Stars Learning Center ("RFTS" or the "Center") in 2005, when she was three years of

---

[4] The factual statement is drawn primarily from the district court's opinion and the administrative record. It is not subject to dispute by the parties except where noted.

age.[5]  During her time at the Center, N.M. received one-on-one ("1:1") Applied Behavioral Analysis ("ABA") therapy throughout the school day.[6]  It was the view of the associate educational director of the Center, Helene Wasserman, who later testified before the state hearing officer, that N.M. was "in need of a one to one [supervision] at all times.  Her behaviors seriously interfere[d] with her learning . . . [and] she had a lot of self[-]injurious behaviors that needed a lot of direct care . . . ."  J.A. 575-76.

In March 2008, a New York City Department of Education Committee on Special Education (the "Committee") was convened to create an IEP for N.M. for her kindergarten year, upcoming in September 2008.[7]  The IEP prepared by the Committee recognized that N.M. required "highly intensive" supervision, J.A. 691, but it did not provide for full-time 1:1 instruction.  Instead, it called for N.M.

---

[5] The record is unclear as to whether E.M. paid tuition to RFTS for N.M.'s pre-school education.

[6] ABA is an "intensive one-on-one therapy that involves breaking down activities into discrete tasks and rewarding a child's accomplishments." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 176 (2d Cir. 2012) (internal quotation marks omitted).  Instructors adept in ABA "use[ ] careful behavioral observation and positive reinforcement or prompting to teach each step of a[n appropriate] behavior." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 226 n.5 (2d Cir. 2012).

[7] An IEP is a "written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *M.H.*, 685 F.3d at 224 (internal quotation marks omitted).

to be placed in a special education classroom with a staffing ratio of 6:1:1 (six students for every one teacher and one paraprofessional), and directed that N.M. receive instruction on a twelve-month calendar. It also included a Behavioral Intervention Plan ("BIP") for N.M., and it recommended, among other things, that the Department (1) provide 1:1 occupational therapy for thirty minutes twice a week; (2) provide 1:1 physical therapy for thirty minutes twice a week; and (3) provide 1:1 speech and language therapy for forty-five minutes three times a week. In other words, under the IEP proffered by the Department, N.M. was slated to receive a total of four hours and fifteen minutes of 1:1 educational services each week.

      B.    <u>Re-enrollment in RFTS</u>

E.M. evaluated the Department's recommended public classroom placement for her daughter in early summer 2008, and found it unsuitable. In her view, where there were more students than teachers in the classroom, it would be impossible for her child to receive the very close supervision that she needed, and which E.M. believed should be 1:1 during the whole school day.

On August 15, 2008, E.M. notified the Department that she would re-enroll N.M. at the Center for the 2008-2009 school year. Three days later, she formally

7

enrolled N.M. there by signing an enrollment contract. The executed contract provides that E.M. and her husband "assume . . . complete financial responsibility for the enrollment of [N.M. at RFTS] for the year 2008-2009," and that they agree "to pay when due the Annual Tuition and Fees." J.A. 759. The contract specifies an annual tuition of $85,000, but leaves blank the spaces provided for designating a payment schedule and the amount of a deposit that "must accompany this signed Contract to make it valid." *Id.*

In an affidavit, Nancy Levy, General Co-Director of RFTS, explained that as of November 12, 2008, the Center had received no tuition payment for N.M., but that the parents and school had agreed that E.M. and her husband would contact an "advocate or attorney and seek funding" from the Department.[8] J.A. 758. E.M. later testified that, as of May 2009, she had not paid any tuition to the Center for the 2008-2009 school year because "we don't have that money to pay the school." J.A. 536.[9]

---

[8] Ms. Levy's statement appears to refer to an oral side agreement that was never reduced to a signed writing, and whose exact terms are unclear from the record. The only signed writing between E.M. and the Center that we see in the record is the enrollment contract itself, which Levy elsewhere stated constituted "the entire tuition agreement signed by the parent." J.A. 758.

[9] The record suggests that E.M.'s household income during the relevant period was less than $15,000 per year. *See* J.A. 539-40.

C.    Due Process Complaint

By letter dated November 26, 2008, E.M. (through counsel) submitted to the Department a request for an impartial hearing under the IDEA. The request stated that E.M. "rejected the recommended program because she maintains that [N.M.] requires one to one teaching across all domains to master any skill." J.A. 750.

D.    December 2008 IEP

In December 2008, the Department convened a second Committee and amended the first proposed 2008-2009 IEP for N.M., taking into account new evidence submitted by Department officials who had observed N.M. at the Center and the reports on N.M.'s progress that were made by Center employees. The new evidence included a classroom observation report completed by a Department official, who observed that N.M. "pokes her eyes, bangs her head and throws herself backwards onto the floor. She is self-injurious and aggressive to others. She jumps, gallops and flaps." J.A. 123. Although the amended IEP expanded N.M.'s access to related services, it did not alter the Committee's previous recommendation that N.M. be placed in a 6:1:1 classroom. J.A. 737. E.M. renewed her challenge to the Department's proffered IEP.

## II.    Procedural History

### A.    IHO Opinion

Between March and May 2009, the Department and E.M. submitted evidence to an Impartial Hearing Officer ("IHO") charged with addressing E.M.'s allegations that, like the earlier IEP, the December 2008 IEP was substantively deficient because (among other flaws) it did not provide N.M with all-day 1:1 supervision.[10]

In a written opinion issued in June 2009, the IHO denied N.M.'s request for tuition reimbursement or direct payment to the Center.  Declining to address the substantive question whether N.M. would have received a FAPE in the educational setting proposed by the IEP, the IHO concluded instead that, as argued by the Department, E.M. lacked standing to bring a claim for tuition reimbursement because she "has paid nothing to [RFTS] for Student's enrollment there during the 2008-2009 school year, nor does it appear that [she] is in any way obligated to do so."  J.A. 192.  The IHO found that, when E.M. enrolled her daughter in RFTS, she was "clearly without the financial resources that would

---

[10] The IHO presides at the IDEA-mandated "impartial due process hearing," 20 U.S.C. § 1415(f), hosted by the local school district — in this case, the New York City Department of Education. In New York State, the IHO's decision may be appealed to a State Review Officer.  *M.H.*, 685 F.3d at 224-25.

10

have permitted the incurrence of such debt," and therefore she had not incurred any financial risk or obligation. J.A. 191, 193. The IHO further rejected E.M.'s request for an order directing the Department to pay the Center directly, reasoning that the IDEA restricts "the right and opportunity to seek recourse under its provisions solely to parties for whom [the] legislation was intended — the disabled and the parents of the disabled." J.A. 193-94. According to the IHO, the Center — not E.M. — was the real party in interest with respect to plaintiff's direct payment request, and because the Center has no legal remedy under the IDEA, E.M.'s request for direct payment had to be denied.

### B. SRO Opinion

Plaintiff appealed to a State Review Officer ("SRO"), who reviewed the written record *de novo*. The SRO agreed with the IHO that E.M. lacked standing to request that the state pay her daughter's tuition to the Center for the 2008-2009 school year. Departing from the IHO's approach, however, the SRO also chose to consider, for the first time, "the parent's allegation that the district did not offer the student a FAPE during . . . 2008-09." J.A. 130.

On that issue, the SRO reviewed the record developed before the IHO and concluded that "the special education program recommended by the

11

[Department] for the student's 2008-09 school year appropriately addressed [N.M.'s] unique special education needs." J.A. 137. The SRO found that the "evidence establishe[d] that the March 5, 2008 IEP was appropriate for the student because her cognitive, academic, and social delays prevented her from participation in the general education environment and that the district's 6:1+1 special class, with programmatic supports, would enable the student to receive educational benefits." *Id.* (internal quotation marks omitted). Although the SRO did not identify with precision the "programmatic supports" that would render the 6:1:1 classroom sufficient for N.M. to receive an educational benefit, he relied in part on testimony from a teacher in N.M.'s proposed public school classroom who testified at the hearing before the IHO that, in the SRO's words, "[i]f the student required 1:1 attention during the entire school day . . . [the teacher] would make sure that either she or a paraprofessional worked with the student at all times, having done so previously for another student during the first two months of the school year, until that student became more independent." J.A. 136.

C.    District Court Opinion

On December 31, 2009, E.M. filed suit in Federal District Court for the Southern District of New York, asserting that the Department had denied her daughter a FAPE and seeking reversal of the SRO's decision.  Among other remedies, E.M. sought an order requiring the Department to make direct payment of N.M.'s tuition for the 2008-2009 school year to RFTS.

The district court decided, first, that E.M. had standing to bring this suit even if she had not paid tuition to RFTS.  *See E.M.,* 2011 WL 1044905, at *6.  In support of its ruling on standing, the court quoted favorably from another district court decision within this Circuit, *S.W. v. New York City Department of Education*, 646 F. Supp. 2d 346 (S.D.N.Y. 2009), which held that the denial of a FAPE, without more, constitutes an injury sufficient for a parent to satisfy the standing requirement.  *See id.* at 359.

Next, the district court addressed whether N.M. had been provided a FAPE.  Because the IHO had not reached this issue, the only relevant factual findings were made by the SRO as part of its alternative analysis.  The district court ruled that the SRO considered all of the relevant evidence, properly concluded that N.M. had a possibility of advancement in the 6:1:1 classroom, and

13

did not err in concluding that the IEP was substantively adequate. *E.M.*, 2011 WL 1044905, at *8-10. As part of its analysis, the district court noted that, at the time of its decision, no Second Circuit cases "st[ood] for the proposition that an SRO may not consider evidence extrinsic to the written IEP." *Id.* at *9. Therefore, "[i]t was not error for the SRO to consider [testimony about the nature of the placement actually offered for N.M. in the IEP]," and the "SRO's judgment that the 6:1:1 placement was likely to confer educational benefits is therefore deserving of deference." *Id.*[11] The court denied plaintiff's request that the Department remit N.M.'s tuition to RFTS.

Plaintiff timely appealed

## DISCUSSION

### I.    Standing

The Department did not cross-appeal the district court's ruling on plaintiff's standing under Article III to pursue her claim for direct payment. Because it affects our subject-matter jurisdiction, however, we are obligated to consider the question of our own accord.

---

[11] The district court also concluded that the Department had not violated N.M.'s procedural rights under the IDEA by denying N.M. a Functional Behavioral Assessment. It was deemed unnecessary because the Department had created a BIP that adequately considered "behavioral interventions and strategies to the extent required by IDEA." *Id.* at *7.

A.    Background Principles

Article III, Section 2, of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies."  As part of this limitation, parties seeking to bring suit in federal court must establish standing under Article III to assert their claims.

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court articulated three separate requirements for constitutional standing.  First, the plaintiff must have suffered an "injury in fact," — that is, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (internal citations, quotation marks, and footnote omitted).  Second, "there must be a causal connection between the injury and the conduct" of which the plaintiff complains.  *Id.*  And third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561 (internal quotation marks omitted).  At issue in this case are the first and third of these requirements: injury in fact and redressability.

Whether a plaintiff has suffered an injury in fact turns neither on the plaintiff's subjective experience of the harm she alleges nor on the "merits of the

15

plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also* William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 229-34 (1988). Rather, whether a plaintiff has standing to assert a claim in federal court depends on "the nature and source of the claim asserted." *Warth*, 422 U.S. at 500; *see also W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). In essence, the standing question is determined by "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500; *see generally* Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, HART & WECHSLER'S THE FEDERAL COURTS & THE FEDERAL SYSTEM 140-48 (6th ed. 2009) (discussing Congress's power to confer standing to sue by statute). "While the injury-in-fact requirement is a hard floor of Article III jurisdiction that cannot be removed by statute, it has long been recognized that a legally protected interest may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170, 175 (2d Cir. 2012) (internal quotation marks and citations omitted).

As for the third requirement of constitutional standing — that the harm alleged be redressable by a favorable decision — the Supreme Court has instructed that the "necessity that the plaintiff who seeks to invoke judicial power" be in a position to benefit in some personal way "remains an Art. III requirement." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 39 (1976); *see also Coal. of Watershed Towns v. EPA*, 552 F.3d 216, 218 (2d Cir. 2008) ("'Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998))). A plaintiff need not demonstrate with certainty that her injury will be cured by a favorable decision, but she must at least make a showing that there is a "substantial likelihood that the relief requested will redress the injury claimed." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978) (internal quotation marks omitted); *see also W.R. Huff*, 549 F.3d at 106-07 (defining "*redressability*" as "a non-speculative likelihood that the injury can be remedied by the requested relief"). This requirement lies at the core of the standing doctrine. As commentators have noted, "An abstract decision without remedial consequence seems merely advisory, an unnecessary expenditure of judicial resources that burdens the adversary and carries all the traditional risks of

17

making bad law and trespassing on the provinces of the executive and legislature."  Wright, et al., 13A FED. PRAC. & PROC. § 3531.6 (3d ed. 2008).

B.     Standing in the IDEA Context

The IDEA is concerned fundamentally with making educational opportunities available to disabled children, free of charge to them and their families.  *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 13 (1993) ("*Carter*") ("IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free.").  As the Supreme Court has explained, the Act also recognizes parents' unique and personal stake in their child's educational progress.  In *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007), for example, the Court held that parents have standing to pursue IDEA claims on behalf of their child or on their own behalf.  *Id.* at 535.  As the Court there observed, the IDEA "requires, in express terms, that States provide a child with a free appropriate public education 'at public expense,' . . . including specially designed instruction 'at no cost to parents.'"  *Id.* at 532 (quoting 20 U.S.C. §§ 1401(9)(A), (29)).  The Court concluded that "[p]arents may seek to enforce this mandate through the federal courts . . . , because among the rights the[] [parents] enjoy is the right to a free appropriate public education for

18

their child." *Id.*; *see also Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 158 (2d Cir. 1992).

The remedies available under the IDEA and the urgency of a child's educational needs complicate the applicable standing analysis. For example, when parents believe the local public school district has denied their child a FAPE, one option available to them is to keep the child enrolled in public school and seek administrative (and, later) judicial review of the child's IEP for the purpose of obtaining "compensatory" education. *See Somoza v. New York City Dep't of Educ.*, 538 F.3d 106, 109 (2d Cir. 2008).[12] Courts have long recognized, however — in light of the irreversibility, in an educational setting, of a child's lost time — that parents challenging an IEP may also unilaterally withdraw their child from the public school district, and obtain "reimburse[ment] . . . for their expenditures on private special education for [that] child if [a] court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985) ("*Burlington*"); *see also Carter*, 510 U.S. at 15 (stating that, under

---

[12] "'Compensatory education' is prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education." *Somoza*, 538 F.3d at 109 n.2.

*Burlington*, parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk," and "are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act" (internal quotation marks omitted)). Thus, under what has come to be known as the "*Burlington-Carter* test," parents who have unilaterally placed their child in private school will be entitled to reimbursement if (1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement is appropriate to meet the child's needs, and (3) equitable considerations favor reimbursement. *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014).[13]

---

[13] In 1997, following the Supreme Court's decisions in *Burlington* and *Carter*, Congress amended the IDEA and added a statutory unilateral withdrawal and reimbursement remedy. *See* 20 U.S.C. § 1412(a)(10)(C)(ii). In *Forest Grove School District v. T.A.*, 557 U.S. 230 (2009), the Supreme Court examined the 1997 amendments, and held that they did not alter the *Burlington-Carter* framework. *See id.* at 239-40. The Court explained that the amendments "preserved the Act's purpose of providing a FAPE to all children with disabilities" and "did not change the text of the provision we considered in *Burlington*, § 1415(i)(2)(C)(iii), which gives courts broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education when a school district fails to provide a FAPE." *Id.* at 239. We therefore continue to look to *Burlington* and *Carter* for guidance on the scope of the remedies contemplated under the IDEA.

As the Supreme Court observed in the seminal *Burlington* decision, the administrative and judicial review process "is ponderous." 471 U.S. at 370. Unilateral withdrawal, therefore, will in most cases be the parents' most attractive option when faced with an IEP to which they object:

> A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, *which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would*, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.

*Id.* (emphasis added). Faced potentially with years of litigation to correct an IEP they consider deficient, parents have every incentive to enroll their child in a more suitable school environment while the review process takes its course.

In the quoted text, the *Burlington* Court seemed to cast the unilateral-withdrawal option as being available — as a practical matter — only to "conscientious parents *with adequate means*" to foot the bill for private school tuition while their IDEA claims are adjudicated. *Id.* (emphasis added). But the question we encounter here — whether such a remedy is available under the

21

IDEA to parents *without* adequate means — was not the *Burlington* Court's focus. The IDEA promises a free appropriate education to disabled children without regard to their families' financial status.

As represented in briefs by *amici*: "Low-income parents — unlike parents with more resources — cannot afford to pay for tuition at an appropriate private school and seek reimbursement later," but there are some private schools that "are willing to allow low-income students to begin attending without an advanced tuition payment while the students' parents pursue their due process remedies [under the IDEA]." *Amici Curiae* Letter Br. of Advocates for Children of New York, Legal Services NYC Bronx, Manhattan Legal Services, New York Lawyers for the Public Interest, Queens Legal Services, and South Brooklyn Legal Services in support of Plaintiff-Appellant ("*Amici* Letter Br.") at 4. Recognizing this practice, a growing number of our district courts have recently held that the IDEA permits courts, in appropriate cases, not only to order "reimbursement" of tuition costs to parents, but also to order retrospective payment of tuition directly to the private school where a parent has unilaterally

22

enrolled her child.[14]  *See, e.g., Mr. & Mrs. A. ex rel. D.A. v. New York City Dep't of Educ.*, 769 F. Supp. 2d 403, 428 (S.D.N.Y. 2011) (Gardephe, J.) ("*Mr. & Mrs. A.*") ("Where, as here, parents lack the financial resources to 'front' the costs of private school tuition, and in the rare instance where a private school is willing to enroll the student and take the risk that the parents will not be able to pay tuition costs — or will take years to do so — parents who satisfy the *Burlington* factors have a right to retroactive direct tuition payment relief.").[15]

---

[14] Although E.M. is seeking "retroactive," rather than "prospective," funding of tuition, we note that courts have long held that, when a state-level administrative authority determines that a proposed IEP is inadequate and the disabled child lacks the financial means to meet the cost of private-school tuition pending a final decision on the merits, courts may order the public school district to pay, *prospectively*, the cost of private-school tuition as the administrative and judicial process unfolds.  *See, e.g., Susquenita Sch. Dist. v. Raelee S. ex rel. Heidi S.*, 96 F.3d 78, 85-87 (3d Cir. 1996) ("The purpose of the Act, which is to ensure that every child receive a 'free and appropriate education' is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education."); *see also Connors v. Mills*, 34 F. Supp. 2d 795, 802-06 (N.D.N.Y. 1998) (stating, in dicta, that when the *Burlington-Carter* factors are met, the IDEA permits district courts to order prospective funding for a unilateral placement in appropriate circumstances).

[15] *See also P.K. ex rel. S.K. v. New York City Dep't of Educ.*, 819 F. Supp. 2d 90, 118 (E.D.N.Y. 2011) (Johnson, J.) ("[W]here the parents have prevailed on each of the three prongs of the Burlington-Carter test, the IDEA authorizes a court 'to award retroactive direct payment of private school tuition.'" (quoting *Mr. & Mrs. A.*, 769 F. Supp. 2d at 427)), *aff'd*, 526 F. App'x 135 (2d Cir. 2013); *W.W. v. New York City Dep't of Educ.*, No. 12 Civ. 7196, 2014 WL 1330113, at *2 (S.D.N.Y. Mar. 31, 2014) (Torres, J.) ("If the parent lacks the financial resources necessary to front the costs of private school tuition, the parent may request direct retroactive payment to the private school."); *A.R. ex rel. F.P. v. New York City Dep't of Educ.*, No. 12 Civ. 4493, 2013 WL 5312537, at *10-11 (S.D.N.Y. Sept. 23, 2013) (Crotty, J.) (agreeing with "Judge Gardephe's well-reasoned opinion in *Mr. & Mrs. A.* that a court's broad discretion to grant such relief as is appropriate under 20 U.S.C. § 1415(i)(2)(C)(iii) includes the power, in a proper case, to award retroactive direct payment of private school tuition" (internal quotation marks and alternations omitted)).

In this case, both parties agree (as do we) that the broad spectrum of equitable relief contemplated under the IDEA encompasses, in appropriate circumstances, a "direct-payment" remedy.[16] *Cf. Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 371 (2d Cir. 2006) (noting that the IDEA "confer[s] broad discretion on the district court to grant relief it deems appropriate to parents of disabled children who opt for a unilateral private placement" (citing 20 U.S.C. § 1415(i)(2)(C)(iii))). Indeed, where the equities call for it, direct payment fits comfortably within the *Burlington-Carter* framework: like reimbursement, direct payment to the private school that provided the required educational program "merely requires [the school district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Burlington*, 471 U.S. at 370-71. It also furthers the IDEA's remedial purposes by extending the unilateral withdrawal option to parents with limited financial means, who otherwise could not avail themselves of it. *See id.* at 372 ("The [IDEA] was intended to give handicapped children both an appropriate

---

[16] The Department informs us that, "[w]hile [it] agree[s] that direct payment to a private school is an appropriate remedy under the IDEA under certain circumstances, *see Mr. and Mrs. A v. New York City Dept. of Educ.*, 769 F. Supp. 2d 403 (S.D.N.Y. 2011), such action must be made contingent upon a showing by the plaintiff of a legal obligation to pay the school should the plaintiff's attempt at payment [through IDEA litigation against the Department] be unsuccessful, lest the standing requirement be rendered a nullity." Appellee's Letter Br. at 2.

education and a free one; it should not be interpreted to defeat one or the other of those objectives.").

Applying the direct-payment remedy in practice, however, highlights some of the tensions between the statutory enforcement mechanisms available under the IDEA and the standing requirements of Article III. If the parents of a special needs child who is enrolled in a private school have not paid tuition and are not legally obligated to do so, then their standing to pursue IDEA remedies may be called into question. As discussed above, we must ask whether they have suffered an injury in fact. And even if they have, we must inquire further as to how direct tuition funding will redress this injury.

The parties have directed us to only a handful of cases that have addressed these or similar questions. In deciding that E.M. satisfied the elements of constitutional standing, the district court here relied primarily on *S.W. v. New York City Department of Education*, 646 F. Supp. 2d 346 (S.D.N.Y. 2009). There, the district court faced the question whether a parent who alleged that her child had been denied a FAPE had standing to seek direct payment of her child's tuition to the private school where she had unilaterally enrolled her child. *See id.* at 354-55. The court set out the standing problem before deciding that standing existed.

25

The parent's contract with the private school recited that the parent was "dependent upon receiving prospective payment from [the district] in order to make the payment of tuition." *Id.* at 357 (alterations omitted). The court therefore determined that the plain language of the contract "relieved S.W. of financial responsibility in the event that the [the district] refused to pay her son's 2005-2006 tuition." *Id.* at 358. Further, because the parent had "not submitted any evidence that [the private school] believes her to be responsible for tuition payment, nor that they would otherwise seek to hold her liable for noncompliance with the contract," the court concluded that the parent had not asserted an injury in fact based on any financial indebtedness to the private school. *Id.*

Nonetheless, the court in *S.W.* ultimately decided that the parent had standing to assert her claims. Her injury in fact arose not from a financial obligation to the private school, the court reasoned, but from her statutory right to receive a free and appropriate education for her child, at public expense. *See id.* at 358-59. The school district argued that this type of injury could not be redressed by the relief there requested — direct payment to the private school.

But the court dismissed this argument in light of the language and structure of the IDEA:

> The IDEA requires school districts to provide disabled children with a FAPE, which is defined by the statute, in relevant part, as "special education and related services that . . . have been provided at public expense . . . ." Here, it is undisputed that [the child] received an appropriate education at [the private school], but importantly, that education was not provided at public expense. If the Court orders the [district] to pay [the child's] tuition to [the private school], as [the parent] requests, [the child] will have received a FAPE, that is, an appropriate education at public expense.

*Id.* at 359 (quoting 20 U.S.C. § 1401(9)).

The Fourth Circuit reached a different conclusion in *Emery v. Roanoke City School Board*, 432 F.3d 294 (4th Cir. 2005), a case relied on by the Department. In *Emery*, after the public school district failed to prepare an IEP, the father of a disabled child sought reimbursement for payments in amounts totaling over $200,000 that were made to a private, residential educational institution. *See id.* at 296-97. The father's medical insurer had paid the charges for the child's six-month stay in the facility, however, and the father first sought reimbursement for the insurer's costs years after the payments were made. The Fourth Circuit concluded that the father lacked standing to seek reimbursement for the insurer's payments. *See id.* at 299-300.

27

In reaching that conclusion, the *Emery* Court addressed the two injuries-in-fact that might arise from a district's failure to provide a disabled child with the educational services she requires: denial of a FAPE and financial injury. The court reasoned that although a plaintiff may allege an injury in fact arising solely from the denial of a FAPE, the denial of that FAPE was not redressable by the requested relief of tuition payments for an educational term already long passed. *See id.* at 299. In addition, because the plaintiff "waited numerous years to bring" the suit, there would be no way for the district to remedy its past failure to provide a FAPE through the provision of remedial services. *Id.* The court further held that, although a plaintiff may allege a financial injury arising from the outlay of personal funds to pay for private education, since this injury "is a subsidiary of and dependent upon the child's failure to receive a proper education under the IDEA," the plaintiff in *Emery* failed to establish that he suffered any form of monetary loss. *Id.* "Crucially for the purposes of standing," the court held, "he suffered no out-of-pocket loss himself for the services that [the private institution] provided," and he "failed to show how awarding him [reimbursement] would be anything other than a windfall." *Id.*

C.    Application Here

      *1.    The Parties' Arguments*

The Department argues here that the district court erred in concluding that

plaintiff had standing to pursue a direct-payment remedy.  Adopting the view

that "plaintiff's claimed denial of a FAPE is her *grievance*, [but her] *injury in fact*

for purposes of determining standing can only be viewed in financial terms,"

Appellee's Letter Br. at 2,  the Department argues that the evidence —

particularly the affidavit from Nancy Levy, General Co-Director of RFTS —

supports the conclusion that plaintiff has neither paid the Center tuition nor is

obligated to do so.  The Department contends, "[W]here a plaintiff has paid

nothing to the school and, more importantly, where there is no evidence that the

plaintiff is even obligated to do so in the future . . . an award of direct payment to

the private school, while theoretically righting [plaintiff's] grievance in the

abstract, does nothing to redress any actual, concrete injury suffered by the

plaintiff." *Id.*

Plaintiff and her *amici* counter that E.M. has suffered two independent

injuries.  First, relying heavily on *S.W.*, plaintiff argues that she has suffered an

injury in fact arising solely from the Department's failure to provide her child

29

with a publicly funded FAPE. Second, she argues that she is in fact financially obligated to the Center, and that the Center — in the Department's stead — *did* provide an appropriate education. She cites to the plain language of the duly executed enrollment contract, which (as described above) provides that E.M. and her husband "assume, jointly and severally, complete financial responsibility for the enrollment [of their child] in [RFTS] for the year 2008-2009 and agree to pay when due the Annual Tuition and Fees." J.A. 759-61. This financial obligation, she contends, creates an injury in fact.

Direct payment of tuition would redress both of these injuries, according to E.M. With regard to the denial of a FAPE, direct payment would ensure that plaintiff's child was provided a free appropriate public education in 2008-2009 *at public expense*, as provided for by the statute. With regard to plaintiff's financial injury, direct payment would relieve plaintiff of her obligation to pay tuition to the Center.

2. *Plaintiff Has Standing to Seek Direct Payment under the IDEA Based on Her Contractual Obligations to RFTS*

Based on the record before us, we conclude that plaintiff has standing to seek direct retrospective tuition payment to the Center. As an initial matter, we

30

note our agreement with plaintiff and her *amici* that E.M.'s claimed denial of a FAPE constitutes an injury in fact, and not merely a "grievance," as the Department contends. But we need not decide today the thorny question whether the denial of a *publicly* funded FAPE, standing alone, is an injury that is "redressable" by an order requiring the Department to pay the child's private-school tuition directly.[17] Rather, the record provides a narrower ground for our decision, albeit one the district court did not reach in the first instance.[18] In our view, plaintiff has adequately demonstrated that, as a result of the Department's alleged failure to provide a FAPE, she has incurred a financial obligation to RFTS under the terms of the enrollment contract. Plaintiff's contractual obligation itself constitutes an "injury in fact" for Article III purposes, one that is "redressable" by the direct tuition payment she seeks.

---

[17] We therefore express no opinion on the standing analysis espoused in *S.W.* (and relied upon by the district court below), resting solely on the IDEA's statutory language requiring that a FAPE be provided "at public expense." *See S.W.*, 646 F. Supp. 2d at 359; *E.M.*, 2011 WL 1044905, at *6.

[18] We may, of course, affirm the district court's decision on any ground sufficiently presented by the record. *See Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 275 (2d Cir. 1998) ("It is well settled that we may affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court." (internal quotation marks omitted)).

Relying on the language of the contract as well as extrinsic evidence such as Levy's affidavit and plaintiff's financial condition, the IHO and the SRO concluded that the agreement between the parties did not actually require plaintiff to pay N.M.'s tuition to RFTS, and therefore supplied no basis on which plaintiff could assert standing to sue for direct payment.[19]  Although "[w]e must give due weight to the state proceedings, mindful that we lack the specialized knowledge and experience necessary to resolve questions of educational policy," *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (internal quotation marks and alteration omitted), we need not defer to the findings of state administrative officers on questions, such as contract interpretation or the requirements of standing, that fall outside of their field of expertise, *see M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (observing that the weight due administrative determinations "will vary based on the type of determination at issue"); *see also Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005) (explaining that the "due weight we ordinarily must give to the state administrative proceedings is not implicated with respect

---

[19] As noted *supra*, the IHO and SRO also found that, because plaintiff had not paid any tuition out of pocket, she lacked standing to seek tuition "reimbursement."  J.A. 129, 192.  On appeal, however, plaintiff has made clear that she is not seeking "reimbursement," in the literal sense, for herself, but rather "direct payment" of tuition to RFTS.

32

to issues of law" (internal quotation marks and alterations omitted)). These matters fall within the purview of the lawyer's expertise, not that of the educator.

In this case, we disagree with the IHO's and SRO's analysis, for Article III standing purposes, of the contractual arrangement entered into by E.M. and the Center. We conclude, first, that E.M. has made an adequate showing, based on the unambiguous language of the enrollment contract, that she is obligated to pay (or, at the very least, risks potential civil liability should she fail to pay) tuition to the Center, regardless whether she is successful in obtaining funding from the Department under the IDEA. In our view, that financial obligation, incurred as a result of an allegedly inadequate IEP, satisfies the requirements for standing. But even assuming, as the administrative officers did here, that E.M. has no obligation to pay tuition unless and until she succeeds in her litigation against the Department, we nonetheless conclude that E.M. has standing to bring this claim based on the implied contractual obligation to use her best efforts to pursue her statutory remedies to repay the tuition that the Center has, in effect, "loaned" to her during the 2008-2009 school year. Our reasoning is explained below.

### a. Plaintiff's Contractual Obligation to Pay Tuition Absent Success in Her IDEA Litigation Against the Department

First, contrary to the determinations of the IHO and SRO, we conclude that E.M. has standing to pursue a claim for direct payment under the IDEA based on her contractual obligation to pay private-school tuition. E.M. has made an adequate showing that her contract with the Center requires her to pay tuition even if her IDEA claim against the Department fails to result in funding.

A plain-language reading of the written enrollment contract, *see Kass v. Kass*, 91 N.Y.2d 554, 566-67 (1998),[20] reveals that plaintiff has accepted a legally-enforceable obligation to pay tuition to RFTS. Indeed, pursuant to that contract, plaintiff has assumed, without qualification, "complete financial responsibility for the enrollment" of her child at the Center, and "agree[d] to pay" tuition and fees. J.A. 759. Thus, unlike the plaintiff in *S.W.*, whose enrollment contract with the private school "plain[ly] . . . relieved [the parent] of financial responsibility in the event that the [the Department] refused to pay her son's 2005-2006 tuition," *S.W.*, 646 F. Supp. 2d at 358, E.M.'s written contract with the Center nowhere conditioned her tuition liability on her ability to obtain funding from the Department, *cf. id.* at 357-58 (concluding that parent lacked standing to seek

---

[20] There is no dispute that New York law governs the enrollment contract at issue.

direct payment under the IDEA based on any financial indebtedness to the school where the enrollment contract expressly provided that parent was "dependent upon receiving prospective payment from [the Department] . . . in order to make the payment of tuition," and that the school "has assumed the risk that the Parent may not receive prospective payment from [the Department]" (alterations omitted)).

It is true that certain portions of the enrollment contract — including the payment schedule and the deposit amount — were left blank. *See* J.A. 759. But we are not persuaded that these blank spaces, in a standard-form contract, render the parties' entire agreement void. The contract's essential terms — namely, the educational services to be provided and the amount of tuition — were plainly set out in the written agreement, and we cannot agree that the contract, read as a whole, is so vague or indefinite as to make it unenforceable as a matter of law. *See, e.g., Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587-88 (2d Cir. 1987) ("Although courts are loath to refuse enforcement of agreements on indefiniteness grounds, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by

which such terms may be made certain, then there is no enforceable contract."

(internal citation and quotation marks omitted)); *Cobble Hill Nursing Home, Inc. v.*

*Henry & Warren Corp.*, 74 N.Y.2d 475, 482-83 (1989) (stating that the requirement

of definiteness "is necessarily flexible, varying for example with the subject of the

agreement, its complexity, the purpose for which the contract was made, the

circumstances under which it was made, and the relation of the parties").[21]

The administrative officers, however, rejected this plain-language

interpretation of the enrollment contract based primarily on Nancy Levy's

statement in her affidavit that, as of November 12, 2008, "[n]o tuition has been

received for [N.M.] in accordance with an agreement that [E.M.] would contact

an advocate or attorney and seek funding" from the Department. J.A. 758. The

IHO and SRO appeared to treat Levy's testimony as evidence of an oral side

agreement between the parties that modified the terms of the enrollment contract

so that E.M. would not be required to pay tuition unless and until she recovers a

---

[21] Moreover, it is undisputed that the Center fully performed its obligations under the enrollment contract by providing the promised educational services during the 2008-2009 school year. Thus, even if the writing itself is incomplete, the Center's performance of its contractual obligations (and plaintiff's acceptance of them) arguably evidence a mutual intent to consummate the agreement, thereby triggering plaintiff's reciprocal obligation to pay tuition. *See, e.g.*, *Arbitron, Inc. v. Tralyn Broad., Inc.*, 400 F.3d 130, 136-38 (2d Cir. 2005) (noting that, under New York law, even where some terms are left open, so long as there is sufficient evidence that both parties intended to be bound, the agreement will be enforced).

judgment against the Department. *See id.* at 129, 191-93. On that basis, the administrative officers concluded that E.M. had no real stake in the outcome of this litigation, and therefore lacked standing to pursue her claims. *See id.* at 130, 193-94. We disagree with that assessment.

To begin, the IHO's and SRO's reliance on the Levy affidavit to rewrite the terms of the enrollment contract is misplaced. Although Levy testified that E.M. had not *yet* paid tuition "in accordance with an agreement" to seek funding under the IDEA, J.A. 758, Levy's affidavit is silent on E.M.'s payment obligations should her efforts to obtain public funding fail; indeed, there is nothing in the record to suggest that, if plaintiff's IDEA claim proves fruitless, she is automatically relieved of her contractual promise to pay tuition, *cf. S.W.*, 646 F. Supp. 2d at 357 (parent lacked standing based on financial indebtedness where the enrollment contract "plainly relieved [parent] of responsibility for the cost of her son's tuition"). Thus, while the Levy affidavit may be evidence that the Center agreed to forbear on payment during the pendency of plaintiff's IDEA litigation against the Department, we cannot conclude that its current forbearance conclusively evidences an intention to waive its contractual rights altogether or to forgo enforcement in the future: so long as the limitations period

has not run, a creditor's willingness to be patient with a debtor does not, by itself, render this debt unenforceable as a matter of law. *See, e.g.*, *WMW Mach., Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F. Supp. 734, 748 n.11 (S.D.N.Y. 1997) (stating that, under New York law, "[t]he intention to waive [contractual rights] must be clearly established and cannot be inferred from doubtful or equivocal acts or language" (citing *E. 56th Plaza, Inc. v. Abrams*, 458 N.Y.S.2d 953, 955 (App. Div. 3d Dep't 1983))); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) ("[W]aiver requires a 'clear manifestation of an intent by plaintiff to relinquish her known right' and 'mere silence, oversight or thoughtlessness in failing to object' to a breach of the contract will not support a finding of waiver." (quoting *Courtney-Clarke v. Rizzoli Int'l Publ'ns, Inc.*, 676 N.Y.S.2d 529, 529 (App. Div. 1st Dep't 1998))).

Moreover, even if the Levy affidavit could be interpreted to suggest that the parties orally agreed to modify the written enrollment contract to relieve E.M. of tuition liability, it is unclear whether E.M. could effectively rely on that purported modification to defend against an action on the contract, should the Center later sue her for nonpayment, or (hypothetically) if the Center should change management, or if it should enter bankruptcy and the trustee seek to

38

collect.  Notably, the written enrollment contract signed by both parties contained an express merger clause, which provided as follows:  "This Enrollment Contract contains the entire material terms and conditions" and "no others will be deemed valid unless they are contained in an express writing signed by [the parent] and the School."  J.A. 761.  Accordingly, as a matter of New York law (which governs the enrollment contract), any side agreements between the parties that were not reduced to a signed writing do not — and indeed cannot — modify or negate plaintiff's legal responsibility under the contract to pay the cost of tuition.  *See, e.g.*, *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013).  Thus, because the written enrollment contract appears to be enforceable notwithstanding any purported oral modifications, E.M. has, at the very least, demonstrated a well-founded basis for fearing exposure to suit for nonpayment.  *See, e.g.*, *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (stating that injury in fact "is a low threshold," and "may simply be the fear or anxiety of future harm" (internal quotation marks omitted)); *cf. S.W.*, 646 F. Supp. 2d at 358 (observing that "potential civil liability can constitute an injury in fact," but concluding that the plain language of the enrollment contract at issue there "relieved [the parent] of financial responsibility").

In light of the above, we conclude that E.M. has made an adequate showing, for standing purposes, that she is subject to a contractual obligation to pay private-school tuition to RFTS, and that she incurred that obligation as a direct result of the Department's alleged failure to provide her child a FAPE. That contractual obligation amounts to an injury in fact that can be redressed by a favorable decision in this case: if (after the underlying merits question is adjudicated) the Department is required to pay N.M.'s tuition at RFTS, then plaintiff is no longer obligated to do so. Once relieved of that obligation, she no longer risks being sued for nonpayment or suffering any of the negative effects associated with carrying such a debt.[22] In short, a favorable decision would make plaintiff whole. Under these circumstances, E.M. has satisfied Article III's standing requirements, and may pursue her claim against the Department.

b. Plaintiff's Contractual Obligation to Seek Funding Under the IDEA to Repay Tuition "Loaned" to Her by the Center

Second, even assuming, *arguendo*, that the oral agreement alluded to by the administrative officers below *did* modify the enrollment contract, so that E.M. has no obligation to pay tuition unless she succeeds in her IDEA litigation against the

---

[22] These might include, for example, effects on her borrowing capacity for other purposes, or her relationship with the Center in future years, both with respect to N.M.'s education and the education of one or more of her other children. Indeed, the record reflects that E.M. is the mother of a second, severely disabled child. *See* J.A. 536-37.

40

Department, we nonetheless conclude that E.M. has standing to bring her claim for direct payment. Even under such a modified contractual arrangement, E.M. has impliedly promised to use her best efforts to pursue her statutory remedies to recoup the cost of tuition and repay the Center. And while this arrangement means the Center — rather than E.M. — ultimately bears the risk that E.M.'s litigation against the Department will be unsuccessful, we are not persuaded that this fact necessarily renders the Center the real party in interest, as the administrative officers concluded, or that it otherwise prevents E.M. from pursuing her remedies under the IDEA. Rather, such an arrangement may fairly be interpreted as a "loan" provided by the Center to E.M. — in the form of tuition — with forbearance in exchange for her promise to pursue recompense from the Department that will, in turn, extinguish her debt.

An agreement of this type is roughly analogous to a familiar insurance arrangement known as a "loan receipt." *See, e.g.*, 16 COUCH ON INS. § 222:91 (3d ed. 2012). Under such an arrangement, when an insured suffers a loss at the hands of a third-party tortfeasor, "the insurer lends the insured the amount due on the policy, and the insured pays it back only to the extent that the insured is able to obtain a recovery against [the third-party]." Wright, et al., 6A FED. PRAC.

& PROC. § 1546.  Although the insured is, in essence, suing for the benefit of the insurer, by virtue of the loan receipt the insurer "has not paid the insured's claim and therefore is not subrogated to the insured's rights."  *Id.*  Thus, the insured — not the insurer — has been recognized as the proper party to bring suit.  *See* 16 COUCH ON INS. § 222:91 ("Under the loan receipt relationship, the insurer does not have standing to sue the third party and any such actions would be dismissed for lack of standing or failure to state a cause of action.").

The loan receipt arrangement has long been judicially accepted as a valid mechanism for providing coverage for an insured's losses while allowing her to sue tortfeasors in her own name.  *See, e.g., Luckenbach v. W.J. McCahan Sugar Refining Co.*, 248 U.S. 139, 149 (1918) (describing the loan-receipt arrangement as "consonant both with the needs of commerce and the demands of justice"); *Aetna Ins. Co. v. Henry Du Bois Sons Co.*, 144 F.2d 262, 264 (2d Cir. 1944) (stating that "a [loan] receipt is a lawful contract which will be enforced"); *see also Columbia Grain, Inc. v. Or. Ins. Guar. Ass'n*, 22 F.3d 928, 931 (9th Cir. 1994) (explaining that "with a loan receipt, the insured makes the claim against the third party but may be contractually bound to give the money recovered to the insurer").

Viewed in this light, the reality that the Center ultimately bears the risk of plaintiff's non-recovery from the Department is merely a consequence of the contractual arrangement between it and E.M., and does not dislodge E.M. as the real party in interest. *Cf.* 17 COUCH ON INS. § 241:42 ("An insured, who agrees to sue the one responsible for the damage for the benefit of the insurer, may bring an action for such damages in his or her own name without violating a statutory provision requiring every action to be brought in the name of the real party in interest."). Further, unlike the insurance payments made to the private educational facility in *Emery*, which left the plaintiff there with no obligation of record either to the school or the insurer, the Center's "loan" arrangement with E.M. obliges her to pursue diligently her statutory remedies under the IDEA, and to remit to the Center any recovery she might obtain as a result of her litigation against the Department. Thus, if E.M. prevails on her claims, and is awarded funding from the Department, she will not receive a "windfall," *cf. Emery*, 432 F.3d at 299; rather, she will merely repay a debt incurred as a result of the Department's allegedly inadequate IEP.

In sum, we conclude that, because of her contractual obligation to pay tuition to the Center, E.M. has standing to pursue this claim against the

43

Department, even if the Center may choose not to act upon that obligation unless and until E.M. prevails in her litigation against the Department.

Of course, that plaintiff has standing to pursue her claim does not mean that she is entitled to the relief she seeks. As we have noted, even if a plaintiff satisfies the *Burlington-Carter* prerequisites, "because the authority to grant reimbursement [under the IDEA] is discretionary, 'equitable considerations . . . are relevant in fashioning relief.'" *Frank G.*, 459 F.3d at 363-64 (quoting *Burlington*, 471 U.S. at 374); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47 (2009) (stating that, even if a plaintiff establishes a right to reimbursement under the IDEA, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant"). In making that equitable determination, the district court may consider many factors, including, *inter alia*, whether plaintiff's unilateral withdrawal of her child from the public school was justified, whether plaintiff provided the Department with adequate notice of the withdrawal, whether the amount of private-school tuition was reasonable, whether plaintiff should have availed herself of need-based scholarships or other financial aid from the private school, and whether there was any fraud or collusion in generating (or inflating) the tuition to be charged to the Department,

or whether the arrangement with the school was fraudulent or collusive in any other respect. These factors, however, bear not on our standing analysis under Article III, but on the equities of plaintiff's claim for relief.

## II. Merits

Having concluded that plaintiff has standing to pursue a claim for direct tuition payment to the Center, we now turn to the merits of this dispute. The district court determined that E.M. failed to establish that N.M.'s IEP was either procedurally or substantively inadequate. *See E.M.*, 2011 WL 1044905, at *7-10. Most important for our purposes here, during the course of its analysis of the substantive adequacy of the IEP and whether a 6:1:1 classroom setting would provide an appropriate education, the district court appeared to credit evidence submitted by E.M. that her daughter needed "constant supervision." *Id.* at *8 (internal quotation marks omitted). But the court concluded that the SRO had not erred in approving the 6:1:1 setting. In so doing, the SRO relied in part on testimony from a teacher at N.M.'s proposed public school classroom that the child would be provided with sufficient supervision in the classroom setting — supervision that would approximate 1:1 when needed. *See id.* at *9. The teacher offered testimony, as described above, "about the nature of the placement

45

*actually offered* for N.M. in the IEP." *Id.* (emphasis added). According to the court, "[i]t was not error for the SRO to consider such evidence." *Id.* In making this determination, however, the court noted that, as of the date of its decision, there had been no case from within the Second Circuit "that st[ood] for the proposition that an SRO may not consider evidence extrinsic to the written IEP." *Id.*

That context has now changed. In 2012, our Court issued an opinion in *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d Cir. 2012), in which we expressly addressed whether a district court or state officer may consider and rely on evidence extrinsic to the IEP when deciding whether an educational program provides a disabled child with a FAPE, and adopted "the majority view that the IEP must be evaluated prospectively as of the time of its drafting and . . . that retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered." *Id.* at 186. By way of example, we explained that "testimony may be received that explains or justifies the services listed in the IEP," *id.*, but the district "may not introduce testimony that a different teaching method, not mentioned in the IEP, would have been used," *id.* at 186-87.

46

Particularly relevant to this case, we noted in *R.E.* that "if a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this structure operates and why it is appropriate." *Id.* at 187. But "[i]t may not introduce evidence that modifies this staffing ratio (such as testimony from a teacher that he would have provided extensive 1:1 instruction to the student)." *Id.*; *see also C.F.*, 746 F.3d at 79-80 ("Because the IEP must be evaluated prospectively, without recourse to retrospective testimony, the Department cannot cure [a deficient IEP that failed to include parent counseling or training] by offering testimony that counseling and training would have been offered." (citing *R.E.*, 694 F.3d at 193)). This rule reasonably protects parents who must assess a proffered IEP without the benefit of after-the-fact testimonial modifications.

Here, the SRO relied on testimony from N.M.'s proposed teacher that (as the SRO characterized it) explained how the teacher could "make sure that either [the teacher] or a paraprofessional worked with the student at all times, having done so previously for another student during the first two months of the school year." J.A. 136. In other words, the SRO relied expressly on the possibility, extrinsic to any written education plan, that the teacher in the proposed 6:1:1

47

classroom would provide 1:1 services beyond those specified in the IEP —

precisely what *R.E.* determined to be impermissible.

The parties urge us to reach the merits of this case notwithstanding this

error. We certainly appreciate their desire to resolve this case now without

further litigation, with its attendant delays and costs. But we must decline this

invitation. It would be imprudent for this panel, without any educational

expertise, to decide the merits of E.M.'s claim on a cold record. *Cf. M.H.*, 685 F.3d

at 244 (stating that a court's review of administrative findings in the IDEA

context must "be colored by an acute awareness of institutional competence and

role"). We agree with E.M. that considerable record evidence supports the

conclusion that, in the 2008-2009 school year, N.M. needed constant 1:1 care to

progress. But, as the Department points out, both the Committee social worker

and the teacher in the recommended classroom testified that N.M. could

progress in a 6:1:1 classroom. We are simply not in a position to cull from this

testimony the evidence that *R.E.* permits us to consider and then determine

whether that testimony is credible and persuasive, particularly when the IHO

did not address those questions at all.

For these reasons, we remand this case to the district court for further proceedings consistent herewith. That court might, in its discretion, either decide the merits of the IEP claim, or, perhaps more profitably, remand the matter to state administrative officers for a complete reexamination in light of our instructions in *R.E. See T.L. v. New York City Dep't of Educ.*, 938 F. Supp. 2d 417, 436 (E.D.N.Y. 2013) ("A court may remand a proceeding when it needs further clarification or does not have sufficient guidance from the administrative agencies." (citing cases)). On remand, the district court is free to reexamine any part of its prior analysis, and any other arguments that it did not need to address in its initial decision.

## CONCLUSION

We conclude that, in light of her contractual obligation to pay tuition to the Center, E.M. has Article III standing to pursue her direct-payment claim against the Department. We further conclude, in light of intervening authority, that the district court erred in affirming the SRO's determination that the December 2008 IEP provided a FAPE. We therefore **VACATE** the judgment entered by the district court and **REMAND** the cause for consideration of the merits or further

49

proceedings by the state administrative officers in light of our decision in *R.E. v.*

*New York City Department of Education*, 694 F.3d 167 (2d Cir. 2012).